John and Dolores RANK, etc., Plaintiffs,

v.

Max CLELAND, etc., et al., Defendants.

Civ. No. 76–3265–LEW.

United States District Court,
C. D. California.

Oct. 2, 1978.

John E. McDermott, Richard A. Rothschild, Western Center on Law and Poverty, Inc., Richard A. Paez, Los Angeles, Cal., Legal Aid Foundation of Los Angeles, Jeffrey W. Carver, Pomona, Cal., Legal Services Program for Pasadena and San Gabriel-Pomona Valleys, for plaintiffs.

Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief of the Civil Div., Barry J. Trilling, Asst. U. S. Atty., Los Angeles, Cal., for defendants Max Cleland, Administrator of the Veterans Administration, John Miller, Director of the Los Angeles Office of the Veterans Administration, and the Veterans Administration, an agency of the United States Government.

Franklin K. Lane, Los Angeles, Cal., for defendant Kissell Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WATERS, District Judge.

### FINDINGS OF FACT

The material facts in this case are not in dispute, and have for the most part been agreed to by all parties to this action.

1. John and Dolores Rank, husband and wife, and plaintiffs in this action (hereafter Ranks), live with their two adopted children in a two-bedroom house at 1585 Jess Street, Pomona, California, the property which is the subject matter of this action. John Rank is a veteran of the United States Army, and therefore is entitled to the benefits of the Veterans' Housing program established under the Veterans Benefits Act of 1958, 38 U.S.C. §§ 1801 et seq.

2. The defendants in this action are Max Cleland, Administrator of Veterans Affairs; John Miller, Director of the Los Angeles Regional Office of the Veterans Administration; The Veterans Administration and The Kissell Company, an Ohio Corporation.

3. On or about January 20, 1971, the Ranks bought the house at 1585 Jess Street for $16,950. The purchase price was financed by a $16,950 loan from Trinity Mortgage Company, Inc. The loan was secured by a Deed of Trust and Trust Deed Note and was guaranteed by the Veterans Administration (VA) pursuant to the Veterans' Housing Program. Under the loan agreement, the Ranks were to make monthly payments of $148.00 to Trinity Mortgage Company.

4. Sometime in 1972, Trinity Mortgage Co. assigned its rights under the Deed of Trust to MacMillan Mortgage Co. In late 1972 and throughout part of 1973, the Ranks fell behind in their Deed of Trust payments. However, plaintiffs eventually were able to cure their delinquencies.

5. The MacMillan Mortgage Co. assigned its rights under the Deed of Trust to The Kissell Company, the non-federal defendant in this case. Through much of 1974, the Ranks encountered difficulties in making timely monthly payments, but they were able to make all of the 1974 monthly payments.

6. On November 12, 1973, The Kissell Company assigned and transferred to Government National Mortgage Association (GNMA) all interests and rights under the

Deed of Trust and Trust Deed Note. Thereafter, The Kissell Company became the Servicer for GNMA of the Deed of Trust and Trust Deed Note.

7. On December 20, 1974, because of the economic recession of that period, John Rank was laid off from his job as a welder for Freight Liner Corp. in Chino, California, where he was earning about $900.00 per month. With the exception of a two-month job in July and August of 1975, John Rank was unable to secure steady employment until February, 1976. Dolores Rank was unable to work during that period because she was taking care of the Ranks' two adopted children.

8. From January to July, 1975 and from mid-September to February, 1976, Mr. Rank received $360.00 per month in unemployment insurance benefits.

9. From February through April, 1975, the Ranks attempted to contact Kissell Co. in Los Angeles by phone, but Kissell did not return any of their calls. On April 10, 1975, Kissell sent to VA a Notice of Default, stating, "The borrowers have made very little effort to respond to any of our collection attempts. We are scheduling a field visit to determine their ability to reinstate."

10. On April 16, 1975, the Ranks successfully contacted The Kissell Co. and made an appointment to see Mr. Cohen.

11. One week later, the Ranks met with C. B. Cohen of Kissell. The discussion at the meeting centered around the impound account problem and John Rank's inability to make his monthly payments because of his unemployment.

12. The Ranks next turned to the Valley Association of Cities (VAC), an organization which helped home owners with mortgage payment problems. VAC helped arrange another meeting of the Ranks and Cohen on May 7, 1975.

13. At the meeting, Cohen arrived at the conclusion that the Rank family expenses exceeded family income. In reaching this conclusion, however, Cohen counted as monthly expenses certain purchases, such as clothing, that the Ranks considered to be occasional expenses that could be foregone for long periods of time.

14. Also at the meeting, Cohen offered the Ranks the alternatives of selling their house, obtaining a second mortgage, or making payments equal to 1.5 times the regular monthly payments. The Ranks subsequently went to apply for a second mortgage at Aames Home Loan Co. and were turned down because, they were told, Aames was not loaning money in Pomona.

15. On May 13, 1975, the VA sent to John Rank its form letter that followed a lender's Notice of Default. The letter suggested that Rank contact Kissell as soon as possible.

16. Subsequently, a representative from VAC called VA to inquire whether VA could help the Ranks. The representative was informed that unless the Ranks felt that they were being treated unfairly, little could be done.

17. On May 21, 1975, John Rank sent to Kissell money orders for a one-month payment of $148.00, $5.92 late charges, and $58.82 payment for the alleged impound account shortage. In an accompanying letter, he offered to begin making regular monthly payments from that day on, with the understanding that the existing delinquency would be cured at the earliest possible time. The letter stated that Rank was looking for employment.

18. On the same day, in response to the form letter from VA, Rank also wrote to the VA, enclosing a copy of his letter to Kissell. In the letter to the VA, he reported his unemployment, discussed the impound account problem, and discussed his efforts to remedy the delinquency.

19. On May 23, 1975, Russell G. Meyer of Kissell, returned the two money orders along with a reply letter to the Ranks' proposal for curing the delinquency. Meyer stated that Rank's proposal for payment was unacceptable because, based on the earlier meeting with the Ranks, Kissell had concluded that the Ranks spent $149.00 more per month that they took in. He also mentioned a previous record of delinquen-

cies, and stated: "[I]t is obvious you cannot afford this property."

20. On May 29, 1975, VAC called VA on behalf of the Ranks. Lynn Engles, a VA supervisor, took the call and in turn spoke with Cohen of Kissell who told her that the Ranks' plan was too nebulous to satisfy Kissell, and that if they came up with something more substantial, he would reconsider. Subsequently, VAC spoke directly with Cohen, who suggested that something be put in writing.

21. On June 9, 1975, John Rank wrote to Kissell, proposing a payment of $180.00 per month from his unemployment insurance of $360.00 per month. He mentioned that if this proposal were accepted, his food stamp costs would go down, and also stated that he was trying to work out a deferred payment plan with his utility companies. The Ranks never received a reply to this letter.

22. In July, 1975, John Rank obtained his only steady employment of that year. He worked as a welder at Randy Enterprises in La Habra until he was laid off on September 17, 1975.

23. On July 28, 1975, VAC sent a letter to various Kissell offices, with a copy supplied to VA. The letter summarized what had happened to date, complaining that VAC had never gotten a satisfactory answer to its inquiries and that no reply had been sent to the Ranks' letter of June 9th.

24. This letter was answered by Kissell's Western Regional Manager, Russell G. Meyer, on August 7, 1975. Meyer denied that the Ranks had been in contact with Kissell since February, stating that the first communication had been made on April 16th. He summarized the May 7th meeting between the Ranks and Cohen by concluding that the Ranks were spending $149.00 more per month than they were receiving. He acknowledged John Rank's May 21st letter, but stated Kissell had no record of receiving the June 9th letter. He also asserted that Kissell had had only one contact with VAC, that on June 4th. After discussing the Rank's previous payment record, Meyer concluded by contending that Kissell had demonstrated its forebearance in this case by withholding foreclosure action for as long as it had.

25. On September 22, 1975, Kissell sent to VA a Notice of Intention to Foreclose, stating: "The borrower was laid off work for eight months and had just stated that he started back to work. His income is less than his expenses. The borrower has been in touch with the branch, but no arrangements can be made due to the borrowers' financial problems. We recommend foreclosure."

26. On September 23, 1975, Kissell informed the Ranks by letter of the company's intention to foreclose.

27. John Rank called the VA on October 9, 1975, and spoke with Frank Schiada, Rank's Loan Service Representative. Rank told Schiada he was unemployed and doing odd jobs on the side. He said he was willing to pay $180.00 per month to cure his delinquency, but Kissell was not being cooperative. Schiada told Rank that there was nothing VA could do for him.

28. On October 2, 1975, and October 9, 1975, John Rank made calls to Kissell's Ohio office, and was told that his $180.00 per month payment plan was unrealistic, and that he should deal with Mr. Meyer in the Los Angeles office.

29. Subsequently, VA sent to John Rank its form letter that follows the receipt of a Notice of Intent to Foreclose. The letter notified Rank of the impending foreclosure, reminded him that he was in danger of losing his property and incurring a debt to the government, and urged him to contact his mortgage holder.

30. On November 14, 1975, Henry Villa, the Rank family lawyer in Ohio, wrote to Kissell on behalf of John Rank. He informed Kissell of possible money in John Rank's mother's estate and assured the company that Rank would take care of his debts. No reply to this letter was ever received.

31. On December 23, 1975, Kissell filed an official Notice of Default of Property pursuant to California Civil Code Section 2924.

32. In February, John Rank obtained a welding job at Gem Steel Co. in San Dimas. He continued at this job until July, when he was rehired at Freightliner Corporation after his 18 months layoff there. Rank has worked continuously at the Freightliner job since then.

33. On February 19, 1976, Rank went to the Kissell office in Los Angeles. He told Kissell he was back at work, gave Kissell a proposed budget, and offered to pay $220.00 per month.

34. On February 25, 1975, Rank called Kissell and was told that his offer was refused because VA would not allow Kissell to grant forebearance to a borrower more than four months in default.

35. On April 29, 1976, the property at 1585 Jess Street was sold at a non-judicial trustee's sale. Less than one month later, Kissell transferred the grant deed on the subject property to VA.

36. As of January 1, 1975, there were some 471,365 outstanding home loans in the area served by the Los Angeles VA Regional Office (LAVARO) guaranteed by the VA. An estimated 259,250 of these were for homes in Los Angeles County.

37. In 1974, for the area served by LAVARO, 21,565 defaults were reported on loans guaranteed by the VA and there were 2,682 foreclosures. In 1975, 22,370 defaults were reported and 2,191 loans were foreclosed. In 1976, the figures were 20,080 and 1,308 respectively.

38. The persons in LAVARO primarily responsible for serving veteran home owners are Loan Service Representatives. LAVARO employed 14 Loan Service Representatives as of January 1, 1975, 16 as of July 1, 1975, 19 as of January 1, 1976, and 22 as of July 1, 1976.

39. During the 1974 to 1975 period many of the Loan Service Representatives spent the bulk of their time servicing loans in the VA Portfolio Program, a direct loan program, rather than on the home loan guarantee program. However, several persons were hired to work exclusively on guaranteed loans.

40. In addition to the Loan Service Representatives, veteran home owners with VA-guaranteed home loans were also served by two Technical Unit Supervisors, the Chief of Loan Service Claims and the Assistant Chief, Loan Service Claims.

41. The Loan Service Representative and the supervisors named in Par. 40 above are the only persons in LAVARO responsible for assisting veterans with VA-guaranteed home loans.

42. The only method by which VA can tell whether a servicer of a VA guaranteed home loan has performed an adequate job of servicing a particular loan in default is by examining the servicer's summaries of its loan servicing accompanying the servicer's Notice of Default and Notice of Intent to Foreclose.

43. During the time that Frank Schiada was the Loan Service Representative for the Ranks, the Loan Service Representative did not generally see the Notice of Default. It was read and filed by a clerk, who sent out a form letter to the borrower under the signature of the Loan Service Representative. The clerk would only show the Notice of Default to a Loan Service Representative if something unusual appeared on the face of the Notice, such as an untimely filing of the Notice of Default or an abandonment of property.

44. During the same period, when the VA received a Notice of Intent to Foreclose, a clerk would routinely reply through a form letter under the signature of a Loan Service Representative, but the Loan Service Representative would also review the file.

45. From 1974 to 1975, LAVARO never rejected a servicer's Notice of Default on grounds that servicing had been inadequate.

46. From 1974 through 1976, VA never suspended a servicer of VA guaranteed home loans because of the servicer's record of inadequate loan servicing.

47. VA does not send questionnaires to its servicers of VA guaranteed home loans regarding their servicing policies.

48. No training sessions are held by LAVARO to teach servicers how to comply with the VA Lenders' Handbook and other VA circulars regarding servicing.

49. The VA has never undertaken any study or report on the causes or reasons for default by veterans on home loans guaranteed by VA.

50. LAVARO has no educational programs for lenders and servicers on proper servicing policies.

51. In compliance with VA Manual M 26–1, Change 31, p. 37, ¶ C3, which calls for a "brief narrative statement in respect to the servicing policy of the lender and its facilities for servicing loans," the only statement Kissell sent to VA was a 1965 summary of its facilities for servicing, which did not discuss servicing policy.

52. It is the policy of LAVARO that its employees should conduct supplemental servicing only when it is likely to affect a meaningful result, i. e., when the veteran has funds sufficient to cure his or her delinquency.

53. The "Loan Service Report" (VA Form 26–6808), a comprehensive report by the Loan Service Representative of the salient facts of a default, was not utilized with respect to plaintiffs John and Dolores Rank.

54. 38 C.F.R. § 36.4318 provides that upon receiving a Notice of Default or a Claim for a Guarantee or a Notice of Intention to Foreclose, the Administrator of the VA may require the holder of a mortgage to assign the loan to the VA. In the years 1974, 1975, and 1976, no loans were assigned to VA pursuant to Section 36.4318.

55. The applicable criteria for determining whether or not a loan is to be assigned to VA pursuant to 38 C.F.R. § 36.4318 is set forth in VA Manual M 26–3, ¶ 2.39.

56. The Ranks were never informed of the availability of refunding/assignment under 38 C.F.R. § 36.4318; nor were they informed of the applicable criteria for determining whether their loan was to be refunded under 38 C.F.R. § 36.4318.

57. The Ranks were never informed of the LAVARO's adverse decision not to refund and assign their loan under 38 C.F.R. § 36.4318.

58. In deciding against refunding the Ranks' loan under 38 C.F.R. § 4318 the loan service representative who made the decision did not prepare a written statement as to why the Ranks did not meet the applicable criteria set forth in VA Manual M 26–3, ¶ 2.39, sub-section (d) and (d.1).

59. A lender or servicer of a VA guaranteed home loan is never prohibited by VA from accepting a repayment plan or granting some other form of forebearance to a borrower.

60. Lenders participating in the VA home loan guarantee program often receive "discount points". Under the discount point system, a lender will charge the seller of property a percentage of the total amount of the loan that the lender will make to the buyer of the property. This charge is designed to compensate the lender for often receiving lower interest rates for a VA guaranteed home loan than the lender would have received for a conventional loan.

61. Every lender participating in the VA home loan guarantee program is mailed a Lenders' Handbook, and every lender in the region served by LAVARO was mailed a copy of VA's Circular 26–75–8.

62. All of the VA guaranteed home loans in Los Angeles County involved the use of a deed of trust form that included a provision authorizing non-judicial sale pursuant to California Civil Code Section 2924.

63. In 1971, all VA guaranteed home loans in Los Angeles County involved the use of VA form 26–6303 (Home Loan) Rev. June 1963, entitled "Deed of Trust With Assignment of Rents". However, the use of form 26–6303 was considered optional by VA.

## CONCLUSIONS OF LAW

From the above Findings of Fact, the Court makes the following Conclusions of Law.

1. Jurisdiction lies in this Court under the following statutory provisions: 28 U.S.C. § 1331(a) (federal question); 28 U.S.C. § 1361 (mandamus).

 2. 38 U.S.C. § 1801 et seq. & 38 C.F.R. § 36.4300 et seq. impliedly require that VA guaranteed home loans be adequately serviced by the Veterans Administration and private lenders.

3. Implementing § 1804(d) VA Pamphlet 26–7 (the VA Lenders' Handbook), Department of Veterans' Benefits Circular 26–75–9 and internal VA manuals impliedly require that VA and private lenders must take all reasonable measures to avoid foreclosure.

4. The foreclosure avoidance rules impose mandatory duties on both private lenders and the Veterans Administration.

5. The foreclosure avoidance rules are binding on both the Veterans Administration and private lenders notwithstanding the fact that they were not published in the Federal Register pursuant to the Administrative Procedures Act, 5 U.S.C. § 553.

6. The rules regarding servicing must be followed because they constitute the only definitive interpretation of the statutory requirement of adequate loan servicing.

7. Veteran borrowers may maintain civil actions against private lenders and VA charging violation of statutory servicing requirements.

8. Veteran borrowers may enforce the servicing requirements as third party beneficiaries of loan guarantee agreements between VA and private lenders.

9. The servicing requirements of the Handbook, the Circular, and internal VA manuals impose an equitable duty on lenders and VA that can be enforced in an action to set aside a foreclosure.

10. VA and defendant The Kissell Company each violated their statutory duty to take reasonable measures to avoid foreclosure of plaintiffs' VA guaranteed home loan.

11. Under 38 U.S.C. § 1816(a), when a veteran borrower is in default on his VA guaranteed home loan, the VA may refund to the lender the unpaid balance of the obligation and receive an assignment of the loan and security. VA is then in a position to grant forebearance to the borrower.

12. From 1974 through 1976—during which time plaintiffs' home loan was foreclosed—VA refused to implement the assignment program in the Los Angeles region. This refusal constituted an illegal failure to exercise discretion.

13. VA's refusal to assign plaintiffs' loan was an abuse of discretion under the Administrative Procedures Act because plaintiffs clearly met VA's own criteria for assignment set out in VA Manual M 26–3, Change 32, ¶ 2.39(d), p. 42.

14. VA's refusal to assign plaintiffs' loan constituted an abuse of discretion because VA refused to supply reasons for its refusal.