Jane JONES, on her own behalf and on behalf of all others similarly situated, Plaintiff,

v.

EASTERN MAINE MEDICAL CENTER et al., Defendants.

Civ. No. 75–89 ND.

United States District Court, D. Maine, N. D.

March 31, 1978.

MEMORANDUM OF OPINION
AND ORDER

GIGNOUX, District Judge.

In this class action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3), plaintiff Jane Jones, who at the time of the filing of the complaint was a 17-year-old female in her sixteenth week of pregnancy, on her own behalf and on behalf of all others similarly situated, seeks to enjoin the Eastern Maine Medical Center (hereinafter "EMMC"), its President, the Medical Director of its Board of Trustees, and the President of its medical staff, from continuing to withhold use of its facilities to perform elective nontherapeutic second trimester abortions. The plaintiff class has been certified under Fed.R.Civ.P. 23(b)(2) to consist of all present and future women in the second trimester of pregnancy who have requested or will request, and have been or will be refused, elective nontherapeutic second trimester abortions at EMMC.[1] The complaint alleges that the challenged abortion policies of EMMC violate the Equal Protection Clause of the Fourteenth Amendment and plaintiffs' right to privacy in matters concerning marriage, sex and procreation as guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments. By agreement of the parties at the final pretrial conference, the issues presented by the action are limited to whether the refusal of EMMC to perform elective nontherapeutic second trimester abortions constitutes "state action" within the meaning of 42 U.S.C. § 1983, and, if so, whether the Constitution compels EMMC to perform such abortions.[2] Since the Court

Kim Matthews, Susan Bowie, Arthur LaFrance, Bowie & Matthews, Portland, Me., for plaintiff.

Gene Carter, John Wallach, Rudman, Winchell, Carter & Buckley, Bangor, Me., for defendants.

1. Dr. Parker F. Harris, M. D., a member of the medical staff of EMMC and attending physician to plaintiff Jones, originally joined as a plaintiff in the action but has since withdrawn from the case.

2. Plaintiffs have abandoned the alternative claims asserted in their complaint under 42 U.S.C. § 1985(3) and the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* The failure of plaintiffs to show class-based discrimination precludes a cause of action under Section 1985(3). *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). And, of course, if the Court has no jurisdiction of the federal claims asserted by plaintiffs, it has no jurisdiction of the pendent claim based on the Maine Human Rights Act. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 721–29, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3567 at 443–45.

concludes that the challenged abortion policies of EMMC do not constitute state action within the meaning of 42 U.S.C. § 1983, it does not reach the second question of whether the Constitution requires a health care facility which operates under color of state law to perform elective nontherapeutic second trimester abortions.

The action has been tried to the Court, without a jury, and has been fully briefed and argued by counsel. The following opinion contains the Court's findings of fact and conclusions of law as required by Fed.R. Civ.P. 52(a).

## I.

The essential facts, largely stipulated, are undisputed:

1. At the time of the filing of the complaint, plaintiff Jane Jones was a 17-year-old female in her sixteenth week of pregnancy, who wished to terminate her pregnancy by means of an abortion. Dr. Parker F. Harris, a medical doctor practicing obstetrics and gynecology in Bangor, Maine, and a member of the medical staff of EMMC, had examined plaintiff Jones, had determined that an abortion would be in her best interests, and was ready, willing and able to perform an abortion for her. Dr. Harris, on behalf of plaintiff Jones, had requested of and had been denied by the General Administrator of EMMC the use of EMMC's facilities for the performance of a second trimester abortion.

2. The plaintiff class consists of all women in the second trimester of pregnancy who have requested or will request, and have been or will be refused, elective nontherapeutic second trimester abortions at EMMC.

3. Defendant EMMC, is a private, non-profit corporation located in Bangor, Maine. EMMC is the second largest medical center in the State of Maine and serves a six-county region with a total population of over 337,000. It is the only general hospital with over 130 beds in the eastern and northern half of Maine. Several other hospitals serve the Bangor area, including two hospitals located in Bangor itself.

4. EMMC operates 379 licensed beds, 21 of which are reserved for obstetrical use. In 1974, the occupancy rate of all beds at EMMC was 73.2%. For the fiscal year ending on June 26, 1976, the occupancy rate for the obstetrical unit was 59.4%, and in September 1977, was 74.3%.

5. EMMC enjoys exemption from all federal, state or local taxes, except for property taxes imposed on land which is not used for hospital services. The imposition of additional taxes on EMMC would increase its operating expenses and would reduce its ability to maintain services or to expand services.

6. EMMC participates in a bonding program with the Maine Health Facilities Authority (hereinafter "the Authority") and Northeast Bank and Trust Co. (hereinafter "the Bank"), pursuant to powers conferred upon the Authority by 22 M.R.S.A. § 2053–2074. The Maine Legislature created the Authority to assist health facilities obtain long-term financing for capital improvements. In 1972, EMMC entered into a bonding agreement with the Authority, whereby EMMC conveyed its land and existing medical facilities to the Authority and then leased back the medical complex from the Authority. The Authority issued $18,250,000 in tax-free revenue bonds to pay for the cost of acquisition of the medical complex and reconveyed the land and facilities to the Bank as Trustee. Under the terms of the lease between EMMC and the Authority, EMMC forwards rent to the Trustee Bank in monthly installments in an amount sufficient to cover the cost of the bond financing. EMMC used the proceeds of the 1972 issue to construct a new building for medical, surgical and in-patient services. The building was completed in 1974, and is not used to provide maternity or obstetric services.

Following the 1972 issue, EMMC and the Authority entered into another financing plan, similar to the 1972 arrangement, by

which EMMC received an additional $2,750,-000. These funds were used to construct a Family Practice building, completed in 1974. The new Family Practice facility is not used to provide maternity or obstetric care.

Neither the Authority nor its members, employees or agents have attempted to influence the medical policies of EMMC in any manner. The relationship between EMMC and the Authority has been and continues to be purely financial.

7. EMMC is the recipient of a $400,000 grant under the federal Hospital Survey and Construction Act (hereinafter, the "Hill-Burton Act"), 42 U.S.C. § 291 *et seq.* In accordance with applicable regulations, the funds were processed through the Maine Department of Health and Welfare, the predecessor of the Maine Department of Human Services. The grant was used to build a rehabilitation center as part of EMMC's expansion plan completed in 1974. The terms of the Hill-Burton grant require that EMMC annually provide $40,000 of free medical services to indigent patients for a twenty-year period. Although EMMC must meet prescribed construction standards for buildings funded by Hill-Burton grants, no federal or state regulations with respect to the Hill-Burton program control or interfere with EMMC's abortion policies.

8. EMMC is reimbursed under both the Medicare and Medicaid programs for services rendered to patients eligible for such assistance. In fiscal year 1975–76, EMMC received 25.9% of its total patient revenues from Medicare payments and 11.2% from Medicaid payments. To qualify for Medicare-Medicaid reimbursements, EMMC must meet Medicare-Medicaid regulations concerning hospital bed occupancy rates, but no Medicare or Medicaid regulation attempts to influence or otherwise intrude upon the medical policies of EMMC.

9. During fiscal year 1974–75, EMMC received grant money totaling $119,067 from the State of Maine and $230,291 from the federal government. In fiscal year 1975–76, state and federal grant figures were $124,801 and $341,513 respectively.

Such grants in no way were conditioned upon EMMC's adoption of a specific abortion policy.

10. As a licensed general hospital, EMMC is subject to the licensing regulations promulgated by the Maine Department of Human Services and by its predecessor, the Maine Department of Health and Welfare, pursuant to 22 M.R.S.A. §§ 2, 6, 42 as amended, 1811 as amended, 1812–B, 1813–1817 as amended, and 1820. The licensing regulations do not pertain to the abortion policies of a licensed general hospital.

11. In January 1976, EMMC entered into a one-year agreement with the Maine Department of Education and Cultural Services whereby EMMC was designated a Cooperating Institution and undertook to make available certain of its facilities to nursing students attending Eastern Maine Vocational Technical Institute.

12. In his capacity as Chief of Obstetrics and Gynecology at EMMC, Dr. William M. Shubert, in December 1974, recommended that EMMC establish a board composed of competent individuals to review the decisions of EMMC-affiliated physicians to perform abortions on women in their second trimester of pregnancy. Dr. Shubert based his recommendation solely on the medical risks involved in performing mid-trimester abortions. These dangers include but are not limited to hemorrhaging, hypotension, infection, and uterine rupture. His recommendation was not based on moral or religious beliefs.

13. A second trimester abortion requires the participation of a physician, the use of hospital facilities, and the assistance of nurses with training and experience in obstetrics and gynecology. The procedure takes from 24 to 48 hours to complete, the same length of time required for a normal delivery.

14. At a regular meeting of the Board of Trustees of EMMC on April 17, 1975, the following general policy statement concerning second trimester abortions was adopted:

**1160**

It is the concensus of the [B]oard [of Trustees] at this time that the EMMC facilities should not be utilized for second trimester abortions other than to preserve life or health of the mother or to remove a defective fetus.

15. Rule 26a(1) of the Bylaws, Rules and Regulations of the Medical Staff of EMMC currently states and has stated during all times pertinent to this action:

26. Consultations

a. Required consultation.

Except in emergencies consultations with other qualified physicians are required in:

(1) Currettages [sic] or other procedures by which a known or suspected pregnancy may be interrupted.

Rule 26a(1) pertains to all abortions regardless of the trimester of pregnancy.

16. Both in 1975 and in 1976 at least one therapeutic second trimester abortion was performed at EMMC.

17. All abortions at EMMC, whether occurring during the first or second trimester of pregnancy, are performed in the delivery room of the maternity department. The delivery room is the same facility in which births normally take place. The two therapeutic second trimester abortions previously administered at EMMC were performed in the delivery room.

18. The nursing staff of the maternity department at EMMC has signed a declaration in which nursing staff members refuse to assist in second trimester abortions. The nurses base their objections on the grounds that their interests and skills are devoted to the preservation of life and that the EMMC facility in which second trimester abortions are conducted is precisely that department of the hospital which promotes family-oriented delivery and maternity care.

19. Members of the EMMC maternity department nursing staff who had previously signed the statement declining to participate in second trimester abortions did assist in the two therapeutic mid-trimester abortions performed at EMMC in 1975 and 1976.

20. EMMC has not in the past and does not currently attempt to recruit nurses who are willing and capable of assisting physicians in the performance of elective nontherapeutic second trimester abortions.

21. If EMMC were to institute a policy allowing the use of its facilities in the performance of elective nontherapeutic second trimester abortions, it would encounter difficulty in fulfilling the nursing staff needs which such a policy would require.

22. Dr. Parker F. Harris stands willing and capable of performing elective nontherapeutic second trimester abortions at EMMC.

23. No other hospital facility in Maine performs elective nontherapeutic second trimester abortions for Bangor area women.

**II.**

A cause of action under 42 U.S.C. § 1983 requires that a State, not a private party, act to deprive one of constitutionally protected rights. *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 721, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Berrios v. Inter American University,* 535 F.2d 1330, 1331 (1st Cir. 1976).[3] As the Supreme Court aptly has noted, "[T]he question whether particular conduct is 'pri-

---

**3.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The "under color of" state law standard of Section 1983 and the "state action" requirement of the Fourteenth Amendment are generally considered as alternative ways of expressing the same legal principle. *See Fletcher v. Rhode Island Hospital Trust National Bank,* 496 F.2d 927, 929 n. 4 (1st Cir.), *cert. denied,* 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *Lavoie v. Bigwood,* 457 F.2d 7, 15 (1st Cir. 1972).

vate', on the one hand, or 'state action', on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349–50, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority, supra* 365 U.S. at 722, 81 S.Ct. at 860. The Supreme Court also has held that the mere fact an otherwise private entity receives benefit or service from the State, or that it is subject to State regulation, does not by itself convert its action into action of the State. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Jackson v. Metropolitan Edison Co., supra* 419 U.S. at 350, 95 S.Ct. 449. "[T]he inquiry must be whether there is a sufficiently close nexus between the State and *the challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." (emphasis supplied) *Jackson v. Metropolitan Edison Co., supra* at 351, 95 S.Ct. at 453; *Moose Lodge No. 107 v. Irvis, supra* 407 U.S. at 173, 92 S.Ct. 1965; *Burton v. Wilmington Parking Authority, supra.*

Neither the Supreme Court nor the Court of Appeals for this Circuit[4] has analyzed the problem of state action within the context of a private, nonprofit health care facility which receives government aid and which is subject to government regulation, but numerous lower court opinions which have considered the question afford the Court guidance and make clear that none of the indicia of state involvement which plaintiffs cite suffice to imbue the abortion policies of EMMC with the color of state law so as to give rise to a cause of action under Section 1983.

In support of their position that involvement of the State in the actions of EMMC is sufficiently significant to render the abortion policies of EMMC state action, plaintiffs emphasize that EMMC receives Hill-Burton funds, Medicare-Medicaid disbursements and other governmental monetary grants; that the hospital benefits from state and local tax exemption and from the financing program of a state-created bonding authority; and that, as a licensed health care facility, the hospital is subject to extensive regulation by the State of Maine. There is no suggestion in this record, however, to indicate that there is any connection between the abortion policies of EMMC and the fact that the hospital has received Hill-Burton[5] and other public funds, or the fact that the hospital enjoys a tax-exempt status, or the fact that the hospital has benefited from a state bond financing program, or the fact that the hospital is subject to state regulation. None of EMMC's financial dealings with federal, state or local governmental agencies has resulted in governmental dictation or control of EMMC's abortion policies. Nor have plaintiffs shown any government regulation which requires EMMC to adopt a particular position on abortion. The record is clear that EMMC's abortion policy is an internal regulation of the hospital and was in no way caused or influenced by the action of any governmental body. In short, there is no such nexus between the State and the abortion policies of EMMC so that the action of the hospital may be fairly treated as that of the State.

---

**4.** In *Bricker v. Crane,* 468 F.2d 1228, 1231 (1st Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973), the Court of Appeals for this Circuit specifically eschewed reaching a decision whether the reception of funds under the Hill-Burton Act and other government programs was sufficient to imbue the hospital with state action. *Doe v. Hale Hospital,* 500 F.2d 144 (1st Cir. 1974), *cert. denied,* 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975), and *Hathaway v. Worcester City Hospital,* 475 F.2d 701 (1st Cir.), *application for*

*stay of mandate denied,* 411 U.S. 929, 93 S.Ct. 1888, 36 L.Ed.2d 388 (1973), both were concerned with the obligation of a public, city-owned hospital to make its facilities available to women seeking either sterilizations or first trimester abortions.

**5.** The fact that the hospital has received financial assistance from the federal government is not a factor in considering the presence of state action for purposes of Section 1983. *Berrios v. Inter American University, supra* at 1332 n. 5.

On facts remarkably similar to those presented in the instant case, the Court of Appeals for the Fifth Circuit has lucidly and comprehensively rejected the argument that governmental financial involvement with and licensing of a private, nonprofit hospital transform the hospital into a state actor. *Greco v. Orange Memorial Hospital Corporation,* 513 F.2d 873 (5th Cir.), *cert. denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). Specifically at issue in that case was the defendant hospital's ban on elective nontherapeutic abortions. In an attempt to demonstrate state action within the terms of 42 U.S.C. § 1983, plaintiff relied upon the facts that defendant received Hill-Burton grants, that construction of the hospital facilities was funded in part by bonds issued by Orange County, Texas, that defendant leased the land and buildings housing its facilities from Orange County, that under the terms of its lease with Orange County defendant was required to accept indigent patients, and that the hospital benefited from tax-exempt status. Despite the manifold ties between the State and defendant hospital, the *Greco* court concluded that, for purposes of challenging defendant's abortion policies, state action did not exist. As in the present case, plaintiff in *Greco* had failed to establish a nexus between general governmental involvement with the hospital and the abortion policy then under scrutiny. *Id.* at 880–81. Absent a showing that the State was involved in the very activity challenged, the court held that plaintiff had failed to establish a cause of action under Section 1983.

Reaching the same result as *Greco* on like facts is *Doe v. Bellin Memorial Hospital,* 479 F.2d 756 (7th Cir. 1973). In *Bellin* plaintiff and her physician brought an action under 42 U.S.C. § 1983 against a private hospital challenging the policy of the hospital to permit its facilities to be used for abortions only in those circumstances where the abortion is required for medical reasons. Although the defendant hospital had received Hill-Burton grants and state funding and was subject to state regulation, the *Bellin* court found that these facts

alone were inadequate to establish that the abortion policy in question was "directly or indirectly influenced by the State or by persons acting under color of State law." *Id.* at 757.

Similarly, when the question of whether the policies of a private hospital reflect state action has arisen in other contexts involving the internal medical and administrative practices of the hospital, such as sterilization policies and procedures for the accreditation of its professional staff, the courts of appeals, with a single exception, have consistently held that governmental funding and other financial aid to and regulation of the hospital do not rise to the level of state action sufficient to state a cause of action under Section 1983, where no connection between the state involvement and the challenged activity of the hospital has been shown. *Schlein v. Milford Hospital,* 561 F.2d 427, 428 (2d Cir. 1977); *Briscoe v. Bock,* 540 F.2d 392, 395–96 (8th Cir. 1976); *Taylor v. St. Vincent's Hospital,* 523 F.2d 75–77 (9th Cir. 1975), *cert. denied,* 424 U.S. 948, 96 S.Ct. 1420, 47 L.Ed.2d 355 (1976); *Watkins v. Mercy Medical Center,* 520 F.2d 894, 896 (9th Cir. 1975); *Ascherman v. Presbyterian Hospital of Pacific Medical Center, Inc.,* 507 F.2d 1103, 1105–06 (9th Cir. 1974); *Chrisman v. Sisters of St. Joseph of Peace,* 506 F.2d 308, 312–14 (9th Cir. 1974); *Jackson v. Norton-Children's Hospitals, Inc.,* 487 F.2d 502, 503 (6th Cir. 1973), *cert. denied,* 416 U.S. 1000, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974); *Ward v. St. Anthony Hospital,* 476 F.2d 671, 675–76 (10th Cir. 1973). *But see Citta v. Delaware Valley Hospital,* 313 F.Supp. 301, 307 (E.D.Pa.1970); *Doe v. Bridgeton Hospital Association, Inc.,* 71 N.J. 478, 366 A.2d 641, 645–47 (1976).

The Fourth Circuit is alone among the courts of appeals in repeatedly holding that the receipt of Hill-Burton funds and participation in Medicare-Medicaid programs amount to state action. *Doe v. Charleston Area Medical Center,* 529 F.2d 638 (4th Cir. 1975); *Duffield v. Charleston Area Medical Center, Inc.,* 503 F.2d 512, 515 (4th Cir.

1974); *Christhilf v. Annapolis Emergency Hospital Association, Inc.,* 496 F.2d 174, 178 (4th Cir. 1974); *Sams v. Ohio Valley General Hospital Association,* 413 F.2d 826, 828 (4th Cir. 1969); *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959, 965–70 (4th Cir. 1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). Plaintiffs place particular reliance on *Doe v. Charleston Area Medical Center, supra,* which held that the defendant hospital acted "under color of" state law for purposes of Section 1983 when the hospital refused to allow its facilities to be used by plaintiff for an abortion. That case, however, is clearly distinguishable. In *Charleston,* defendant's anti-abortion policy paralleled a West Virginia criminal abortion statute prohibiting nontherapeutic abortions, and the president of the hospital testified that the statute was the primary motivation for the policy in question. *Id.* at 643 n. 11. In finding state action, the Fourth Circuit stressed the critical fact that "the anti-abortion hospital policy rests firmly upon what was thought to be the compulsion of state law." *Id.* at 644. To the extent that the Fourth Circuit continues of the opinion that the receipt of Hill-Burton and other governmental funds, without more, may give rise to state action without the showing of any nexus between such funding and the specific activity of the private hospital under scrutiny, this Court, concurring with the views of every other circuit which has considered the question, must respectfully disagree.

Plaintiffs' attempt to bring the instant case within the ambit of *Burton v. Wilmington Parking Authority, supra,* must also fail. The Supreme Court held in *Burton* that a private restaurant owner who refused service because of a customer's race violated the Fourteenth Amendment where the restaurant was located in a building owned by a State-created parking authority and leased from the authority. The Court emphasized that the restaurant's premises constituted physically and financially an integral part of the State's parking project, that the financial success of the parking

garage was attributable at least in part to the continuing viability of the restaurant, and that the restaurant, in turn, benefited from convenient parking facilities for its patrons. The Court concluded that the State had "so far insinuated itself into a position of interdependence with Eagle [the restaurant owner] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id.* 365 U.S. at 725, 81 S.Ct. at 862. In the instant case there exists no such "symbiotic relationship" (*Moose Lodge No. 107 v. Irvis, supra* 407 U.S. at 175, 92 S.Ct. 1965) between EMMC and the State as was present in *Burton.* In addition to the absence of any physical relationship like the one found between the authority and the restaurant in *Burton,* there is also no showing of other mutually conferred benefits which would permit characterizing the hospital and the State as joint venturers.

■ Plaintiffs next urge that state action is present because EMMC, by agreeing to provide free medical assistance to indigents and as a result of its position as the largest and best equipped hospital in the Bangor area, provides an essential public service, and hence performs a "public function." This argument also must fail. It is true that the Supreme Court has found state action present when a private entity exercises powers "traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co., supra* 419 U.S. at 352, 95 S.Ct. at 454. *See, e. g., Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town). In the case at bar, however, EMMC is not engaged in activities peculiarly associated with the sovereign. The provision of health care by EMMC, although of admitted benefit to the commu-

nity, is not a service traditionally or uniquely rendered by the State.[6] *Greco v. Orange Memorial Hospital Corp., supra* at 881–82; *Taylor v. St. Vincent's Hospital, supra* at 77–78. In *Jackson v. Metropolitan Edison Co., supra* 419 U.S. at 353–54, 95 S.Ct. 449, the Supreme Court specifically rejected the contention that a private entity which in some way serves a public function or whose business is "affected with the public interest" is a state actor in all its actions. *See also Evans v. Newton, supra* 382 U.S. at 300, 86 S.Ct. 486.

 Finally, plaintiffs' reliance upon the Maine "conscience law," 22 M.R.S.A. § 1572,[7] is ill-founded. Unlike the West Virginia criminal abortion statute which the Fifth Circuit found directly affected the challenged anti-abortion policy of the defendant hospital in *Doe v. Charleston Area Medical Center, supra,* the Maine statute neither prohibits nor requires the performance of abortions by physicians or health care facilities. Within the context of this case the Maine statute is neutral in meaning and effect and has not been shown to have had any direct or indirect impact upon the abortion policies of EMMC. It does not so involve the State in the hospital's abortion policy as to constitute the latter state action. *Doe v. Bellin Memorial Hospital, supra* at 760.[8]

**III.**

Plaintiffs having failed to establish the state action necessary to sustain a cause of action under 42 U.S.C. § 1983, judgment will be entered dismissing the complaint with prejudice.

IT IS SO ORDERED.

---

6. Because EMMC is not the sole hospital serving the Bangor region, the Court need not reach the question of whether monopoly status so intensifies the public functions of a private hospital that it becomes an instrumentality of the State. *See Jackson v. Metropolitan Edison Co., supra* 419 U.S. at 351–52, 95 S.Ct. 449; *cf. O'Neill v. Grayson County War Memorial Hospital,* 472 F.2d 1140, 1143 (6th Cir. 1973); *Meredith v. Allen County War Memorial Hospital Commission,* 397 F.2d 33, 35 (6th Cir. 1968).

7. 22 M.R.S.A. § 1572 provides in pertinent part: No physician . . . and no hospital or health care facility that refuses to permit the performance of an abortion upon its premises, shall be liable to any person, firm, association or corporation for damages allegedly arising from the refusal, nor shall such refusal constitute a basis for any civil liability to any physician, nurse or other person, hospital or health care facility . . . . .

8. Equally unpersuasive is plaintiffs' effort to analogize the instant case to *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), in which the Supreme Court held invalid as violative of the Equal Protection Clause an amendment to the California Constitution repealing a series of state civil rights and fair housing statutes. The amendment had transformed the right to discriminate into one of the basic policies of the State, had embodied that right in the state constitution, and had permitted those practicing racial discrimination to invoke express constitutional authority for their action. *Id.* at 376–81, 87 S.Ct. 1627. That the Maine conscience law has no such impact and does not affirmatively involve the State in the abortion policies of EMMC is manifest.