John W. FITZGERALD and Jane M.
Fitzgerald, Plaintiffs,

v.

Max CLELAND, in his official capacity
as Administrator of Veterans Affairs,
and Philip Singer Day, Defendants.

Civ. No. 76–54–B.

United States District Court,
D. Maine.

July 30, 1980.

Howard T. Reben, Portland, Me. (Donald F. Fontaine, Portland, Me., of counsel), for plaintiffs.

Paula D. Silsby, Asst. U.S. Atty., Portland, Me. (Thomas E. Delahanty, II, U.S. Atty., Portland, Me., of counsel), for defendant Cleland; George P. Limberis, Bangor, Me., for defendant Day.

## OPINION AND ORDER OF THE COURT

TIMBERS, Circuit Judge: *

This action arises from plaintiffs' default on a home loan guaranteed by the Veterans Administration (VA) and the subsequent foreclosure by the lender, The Bangor Savings Bank (the Bank), and the sale of the property by the VA. Plaintiffs contend (1) that the lender's foreclosure pursuant to 14 Me.Rev.Stat.Ann. § 6203(2) violated their Fourteenth Amendment right to due process; (2) that the VA's participation in the

---

* Of the United States Court of Appeals for the Second Circuit, sitting by designation.

foreclosure proceeding violated their Fifth Amendment right to due process; (3) that the VA's decision without a hearing not to refund their loan after they defaulted was improper; (4) that they are entitled to the surplus realized by the VA as a result of its sale of plaintiffs' property; and (5) that the VA wrongfully removed plaintiffs' personal property from their house.

The action was tried to the Court on June 30, 1980, without a jury, and has been fully briefed and argued by counsel. After carefully considering the evidence as a whole and the arguments of counsel, the Court finds in favor of defendants in all respects and orders that judgment on the merits be entered in favor of defendants on all counts. The following opinion sets forth the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

I

The material facts are not in dispute and for the most part have been agreed to by all parties to this action.

·Plaintiffs John and Jane Fitzgerald are residents of Milton, Vermont. For most of his adult life, John Fitzgerald has served in the military, primarily the Air National Guard. In 1977 he retired from the Air National Guard with the rank of Lieutenant Colonel. In order to supplement his income, he has worked part time for the United States Postal Service since 1958.

In 1971 plaintiffs owned a house and 450 acres in Milton, Vermont. The property was worth $97,000 and had outstanding mortgages of about $15,000. In the spring of 1971 plaintiffs moved to Belfast, Maine. They purchased the Belfast property for $15,000 and obtained a mortgage loan from the Bank for $13,500. Plaintiffs retained all of their Milton property except for the house and one acre which they gave to their son and daughter in exchange for their assuming the mortgage.

On October 26, 1971, plaintiffs also purchased residential property in Castine, Maine, which is the subject matter of this case. The purchase price was $45,000, of which $35,000 was financed by another mortgage loan from the Bank. Because of Mr. Fitzgerald's military service, plaintiffs were eligible for VA home loan benefits. Pursuant to the provisions of 38 U.S.C. §§ 1810–1819 and 38 C.F.R. §§ 36.4300–36.4364, the VA guaranteed the loan. Plaintiffs moved from Belfast to Castine in November of 1971 but retained their Belfast property.

Plaintiffs defaulted on their Castine mortgage payments from September through December 1973 but were able to cure the defaults in the Spring of 1974. From October through December, 1974, however, plaintiffs again defaulted on the Castine mortgage payments. By this time, plaintiffs also had defaulted on their Belfast mortgage payments.

Plaintiffs' explanation for these defaults was that their income had been reduced as a result of the Postal Service terminating Mr. Fitzgerald in 1970 because of scheduling conflicts with his military duties. From 1971 to 1972, Mr. Fitzgerald was on full time active duty with the military and was able to maintain his income. From late 1972 through 1974, however, he was on only half time duty. His income from his Postal Service job during this time would have been about $4,000 to $5,000 a year. The lack of this money, plaintiffs claim, caused them to default on their mortgage payments.[1]

The Court finds, however, that another, more significant, reason for plaintiffs' default was that plaintiffs owned three different pieces of real estate. In addition to owning the houses in Belfast and Castine, plaintiffs had moved back to Milton in 1974. They reacquired the house and one acre

---

1. In this regard, it should be noted that Mr. Fitzgerald successfully challenged his termination from the Postal Service. In 1976 a federal court ordered the Postal Service to reinstate him. *Fitzgerald v. DeVarney*, No. 74–164 (D.Vt. Feb. 17, 1976). The Court also notes

that, although Mr. Fitzgerald was aware that he was eligible for unemployment benefits from 1972 through 1975 when he was not employed by the Postal Service, he chose not to apply for such benefits.

from their son and daughter by reassuming the mortgage and by a verbal promise to pay their son and daughter $4,000. It seems clear that plaintiffs' overextension in real estate was the primary cause for the mortgage payment defaults.

On January 15, 1975, the Bank notified the VA that the mortgage on the Castine property was in default and requested immediate foreclosure because the property was vacant. By letter of January 16, 1975, the Bank informed plaintiffs of its intent to commence foreclosure proceedings against the Castine property. The following day the VA notified plaintiffs by letter of the imminent foreclosure on the Castine property. It is undisputed that plaintiffs received the last two letters.

In response to these notices, plaintiffs informed the Bank that they could not maintain the payments on both the Castine and Belfast properties. Plaintiffs stated that they would like to retain the Castine property and sell the Belfast property. They also said that they could maintain current payments on the Castine property although they could not pay the October to December 1974 payments as to which they had defaulted.[2] The Bank declined this offer and insisted that the defaulted payments also be paid.

Plaintiffs vigorously claim that, shortly after receiving the letters from the Bank and the VA, they also informed the VA that they could maintain current payments on the Castine property. They further claim that they told the VA (1) that Mr. Fitzgerald had been promoted in early 1975 to Lieutenant Colonel, resulting in additional annual income of $2,100; and (2) that the Castine property was for sale, with the exception of a small part which they wished to retain as their retirement home.

The VA denies that plaintiffs informed it of this information. The VA introduced a

Record of Telephone Conversation dated January 20, 1975 between Mr. Fitzgerald and J. L. Donovan, a loan specialist with the VA. The Record indicates that Mr. Fitzgerald stated only that he could not maintain payments on both the Castine and Belfast properties; that "he would try and make a payment or two" on the Castine account; and that he hoped to sell one of the two properties.[3] Giving due consideration to the credibility of the witnesses, the Court accepts the VA's version of the events in question as reflected in the Record of Telephone Conversation.

In early February 1975, the VA considered plaintiffs for participation in a VA refunding program. Under this program the VA, prior to the commencement of foreclosure proceedings, pays the lender the unpaid portion of the veteran's loan and the lender assigns its interest and security in the loan to the VA. 38 U.S.C. § 1816(a); 38 C.F.R. § 36.4318. The veteran then makes his monthly payments directly to the VA which, in effect, has become the lender. Theodore Hodgdon, Chief of Loan Services and Claims for the VA, testified that plaintiffs were denied participation in this program because Mr. Fitzgerald's statements over the telephone to Mr. Donovan indicated that (1) plaintiffs were unable to maintain current payments on the Castine property and (2) plaintiffs did not intend to retain that property since it was unoccupied and up for sale. The VA concedes, however, that plaintiffs were not informed that they were being considered for refunding and that no hearing was held prior to the decision to deny participation in the refunding program.

On March 24, 1975, the Bank foreclosed against the Castine property by having the Sheriff of Chittendon County, Vermont, personally serve plaintiffs with a notice of foreclosure. This procedure was pursuant

---

2. On January 15 and on March 15, 1975, plaintiffs mailed checks totalling $657.38 to the Bank. Of this amount, $620.04 represented two payments on the Castine mortgage and the remainder represented payments on the Belfast mortgage.

3. This Record is part of the agreed statement of facts. There was no objection to the admissibility of the Record. Plaintiffs stipulated that, if Mr. Donovan were to testify, he would state the substance of the Record.

to 14 Me.Rev.Stat.Ann. § 6203(2), which provides for initiation of foreclosure proceedings simply by service of notice upon the mortgagor.[4] 14 Me.Rev.Stat.Ann. § 6204,[5] however, provides that a mortgagor may redeem the property within one year after service of notice pursuant to § 6203(2).

The Bank then elected to assign its interest in the mortgage to the VA in accordance with the VA's guarantee of the loan pursuant to 38 U.S.C. § 1816 and 38 C.F.R. § 36.4320(b). On May 5, 1975, the VA paid the Bank $34,876.27, the total amount then due on the mortgage note, and the VA became subrogated to the Bank's rights in the foreclosure proceedings. 38 C.F.R. § 36.4323(a).

On May 23, 1975, the VA notified plaintiffs that it had acquired the mortgage on the Castine property from the Bank and that, pursuant to 14 Me.Rev.Stat.Ann. § 6204, they had one year from March 24, 1975 to redeem the property. Plaintiffs were given three options for redeeming their property: (1) pay the full amount due on the mortgage ($34,876.27); (2) sell the property and pay the amount due from the proceeds; or (3) arrange for another lender to refinance the mortgage. Plaintiffs did not exercise any of these options. On March 24, 1976, absolute title in the property vested in the VA.

On April 8, 1976, the VA requested that plaintiffs remove their personal property from the Castine premises on or before May 10, 1976. On June 1, 1976 and June 23, 1976, the VA again requested that plaintiffs remove their personal property. On June 29, 1976, the VA notified plaintiffs' attorney that it intended to remove the personal property from the Castine premises on July 6, 1976. On July 6, the personal property was moved from Castine to Bangor Van and Storage Company in Brewer, Maine. On July 9, 1976, the VA informed plaintiffs' attorney of this fact and that the moving costs and first month's storage had been paid, for which it would look to plaintiffs for reimbursement.

On August 24, 1976, defendant Philip Singer Day purchased the property from the VA for $60,000. Of this amount, $10,000 was paid in cash. Day entered into an installment sales contract with the VA for $50,000. As a result of the August 24, 1976 sale to Day, the VA realized, after deducting various expenses, $15,277.66 over and above what it had paid the Bank on plaintiffs' mortgage. Also, a note evidencing the balance due on Day's installment sales contract was sold by the VA with recourse in December 1976 for $52,733.69, resulting in the realization by the VA of an additional $2,733.69. The total sum realized by the VA, $18,011.35, was retained by it despite claims by plaintiffs that they were entitled to it.

4. § 6203(2) provides:

"If, after breach of the condition, the mortgagee or any person claiming under him is not desirous of taking and holding possession of the premises, he may proceed for the purpose of foreclosure in either of the following modes.

. . . .

2. Service of notice. He may cause an attested copy of such notice to be served on the mortgagor or mortgagors, or in case of any recorded transfer or transfers of the mortgaged property since the giving of the mortgage, on the record holder or holders of the title of the mortgaged property at the time of the service of said notice, if he lives in the State, by the sheriff of the county where the mortgagor or the record holder of the title resides, or his deputy, by delivering it to him in hand or leaving it at his last and usual place of abode; and cause the original notice and the sheriff's return thereon to be recorded within 30 days after such service. In case different mortgagors or record holders reside in different counties, then service shall be made of such notice by any sheriff or his deputy upon the mortgagors or record holders residing in the same county as such sheriff or deputy. In all cases the certificate of the register of deeds is prima facie evidence of the fact of such entry, notice, publication of foreclosure and of the sheriff's return."

5. § 6204 provides in pertinent part:

"The mortgagor or person claiming under him may redeem the mortgaged premises within one year after the first publication or the service of the notice mentioned in section 6203, and if not so redeemed, his right of redemption is forever foreclosed."

## II

In the light of the foregoing facts and prior proceedings, the Court turns to the legal issues presented.

### A

Plaintiffs first argue that the foreclosure proceedings in this case violated the due process clauses of the Fifth and Fourteenth Amendments and that, therefore, the foreclosure of their property should be declared a nullity. The Court holds (1) that the Fourteenth Amendment right to due process is not implicated because of lack of state action; and (2) that, even if there were sufficient participation by the VA in the foreclosure proceedings to bring the case within the purview of the Fifth Amendment, the VA did not violate plaintiffs' due process rights.

#### 1.

■ Plaintiffs claim that the provisions for foreclosure set forth in § 6203(2) violate the Fourteenth Amendment right to due process. In considering this claim, the threshold question is whether the Bank's use of that statute to foreclose on the Castine property constituted state action. The Court holds that it did not and therefore does not reach the merits of the Fourteenth Amendment due process claim.

Numerous federal courts have held that state action is not present when a private party forecloses a mortgage pursuant to a non-judicial foreclosure statute. *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 359 (5 Cir. 1977); *Northrip v. FNMA*, 527 F.2d 23, 26–30 (6 Cir. 1975); *Barrera v. Security Building & Investment Corp.*, 519 F.2d 1166, 1169–74 (5 Cir. 1975); *Bryant v. Jefferson Federal Savings & Loan Association*, 509 F.2d 511, 513–15 (D.C.Cir.1974); *Dieffenbach v. Buckley*, 464 F.Supp. 670, 674–75 (D.N.H.1979); *Kenly v. Miracle Properties*, 412 F.Supp. 1072, 1074–76 (D.Ariz.1976) (three-judge court); *Lawson v. Smith*, 402 F.Supp. 851, 854–55 (N.D.Cal.1975); *cf. Y Aleman Corp. v. Chase Manhattan Bank*, 414 F.Supp. 93, 95–96 (D.Guam 1975) (same

result where no statute involved). In all these cases, the mortgage contained a power of sale which authorized the mortgagee to sell the property in the event of default.

In rejecting the argument that enactment of a foreclosure statute constituted significant state involvement in or encouragement of the foreclosure, these courts have reasoned that the statute did not create the mortgagee's right to foreclose by sale. Instead, the statute simply gave effect to a contractual agreement by the parties to waive certain pre-foreclosure rights. *E.g., Barrera v. Security Building & Investment Corp., supra*, 519 F.2d at 1170–71.[6] Thus, rather than creating any new rights in the mortgagee, the statute merely regulated the mortgagee's use of an existing right. Indeed, the state had acted, "however ineffectually", to protect the mortgagor's interest. *Id.* at 1171. Moreover, "[t]o hold that the state, by recognizing the legal effect of [private contractual] arrangements, converts them into state acts for constitutional purposes would effectively erase to a significant extent the constitutional line between private and state action and subject to judicial scrutiny under the Fourteenth Amendment virtually all private arrangements that purport to have binding legal effect." *Id.* at 1170.

However persuasive this line of cases may be, their applicability here is somewhat troublesome. Plaintiffs argue that these decisions are not controlling because their mortgage did not contain a power of sale. Paragraph 12 of the mortgage states that, in the event of default, the Bank

"immediately may start proceedings to protect its interest. In any such proceedings [plaintiffs agree] to pay all reasonable expenses, including a reasonable attorney's fee. In case of a sale or a foreclosure of the premises covered hereby, the said premises may be sold in one parcel."

While plaintiffs may be correct in arguing that this clause does not create a power of

---

6. In addition, these decisions recognized that the mortgagee had long had a common law

right to foreclose by power of sale. *Northrip v. FNMA, supra*, 527 F.2d at 27 & n.3.

sale, it nevertheless constitutes a contractual agreement authorizing the Bank to initiate foreclosure proceedings upon default. Thus, like the mortgagees in the power of sale cases, the Bank was merely exercising its contractual rights. And like the power of sale foreclosure statutes, § 6203(2) operates as a limitation, albeit minimal, on the mortgagee's use of that contractual right by specifying the manner in which the mortgagor must be personally served with notice of foreclosure.[7]

Plaintiffs, however, contend that, by enabling mortgagees to foreclose via the streamlined method set forth in § 6203(2) as opposed to the cumbersome common law method,[8] the state in effect has created new rights in the mortgagees. They correctly point out that Maine is the only state where service of notice can initiate foreclosure proceedings. Osborne, The Law of Mortgages § 315 (2d ed. 1970).

But even if plaintiffs are correct in arguing that § 6203(2) creates new rights in the mortgagee, the First Circuit has expressly rejected this mode of analysis for determining whether state action exists. In *Davis v. Richmond*, 512 F.2d 201 (1 Cir. 1975), the Court held that distraint of a tenant's personal effects pursuant to the Massachusetts boardinghouse lien statute did not involve state action. In response to the tenant's argument that state action existed because the statute created rights which did not exist at common law, the Court stated, in language subsequently approved by the Supreme Court, "we are disinclined to decide the issue of state involvement on the basis of whether a particular class of creditors did or did not enjoy the same freedom to act in Elizabethan or Georgian England." *Id.* at 203, *quoted in Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163 n.13 (1978).

This Court reads *Davis* as fatal to plaintiffs' claim that because the statute creates new rights it therefore constitutes state action. Further support for this position can be found in recent decisions holding that state action is absent in non-judicial foreclosure statutes which create a power of sale in the mortgagee even if the mortgage agreement itself does not contain such a power. *Charmicor, Inc. v. Deaner*, 572 F.2d 694, 695–96 (9 Cir. 1978); *Levine v. Stein*, 560 F.2d 1175, 1176 (4 Cir. 1977), *cert. denied*, 434 U.S. 1046 (1978). Unlike the statutes in the power of sale cases discussed above which merely confirmed contractual power of sale rights, the statutes in *Charmicor* and *Levine* actually conferred such a right on the mortgagee. *E.g., Charmicor v. Deaner, supra*, 572 F.2d at 695. Neverthe-

---

7. A second problem is that this contractual provision amounts to a waiver of certain pre-foreclosure rights. *Bryant v. Jefferson Federal Savings & Loan Ass'n, supra*, 509 F.2d at 515. The question then becomes under what circumstances is such a waiver effective. The question of whether the waiver is effective has arisen only in cases where state or federal action is found or assumed to exist. *E.g., Ricker v. United States*, 417 F.Supp. 133, 139–40 (D.Me.1976); *Law v. USDA*, 366 F.Supp. 1233, 1239–40 (N.D.Ga.1973). The *Ricker* court treated the issue as one of waiver of a constitutional right and required that it be "voluntary, knowing, and intelligently made". 417 F.Supp. at 139. If, as in this case, state or federal action is lacking, however, no constitutional right would seem to be involved and therefore the much less stringent standard applicable to the waiver of an ordinary contractual right should apply. Most of the power of sale cases which have concluded that state action is lacking do not mention waiver and apparently assume that the waiver is effective. Indeed, the Supreme Court has observed that

the validity of a contractual power of sale is "unquestionable". *Scott v. Paisley*, 271 U.S. 632, 635 (1926); *see Barrera v. Security Building & Investment Corp., supra*, 519 F.2d at 1172–73. Implicit in these cases is the judicial reluctance to interfere with freedom of contract and the recognition of the wide-ranging effects that a finding of ineffective waiver would have on many mortgages.

In any event, the Court concludes that the waiver in this case was effective. This case is distinguishable from *Ricker*. There the mortgagors were an elderly farm couple in their seventies; neither of them had more than a sixth grade education. Mr. Fitzgerald on the other hand is a Lieutenant Colonel in the Air National Guard with four years of college. In addition, based upon his testimony at trial, the Court finds him to be considerably knowledgeable about real estate matters.

8. *See generally* Comment, *The Constitutionality of Maine's Real Estate Mortgage Foreclosure Statutes*, 32 Me.L.Rev. 147, 149–51 (1980).

less, the statutory source of the power did not transform a private, non-judicial foreclosure into state action. "[T]he statute creates only the right to act; it does not require that such action be taken." *Id.* (quoting *Melara v. Kennedy*, 541 F.2d 802, 806 (9 Cir. 1976)).

The Supreme Court recently has confirmed that the focus of the state action inquiry in this area should not be whether a statute changes the common law but rather whether the state is responsible for the challenged action. In *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978), the Court held that a warehouseman's threatened sale of goods pursuant to New York's version of § 7–210 of the Uniform Commercial Code did not involve state action. This right of sale was neither contractually authorized, *id.* at 169 n.2 (Stevens, J., dissenting), nor recognized at common law. *Brooks v. Flagg Brothers, Inc.*, 553 F.2d 764, 771–72 (2 Cir. 1977), *rev'd*, 436 U.S. 149 (1978). The Supreme Court reasoned that "the State of New York is in no way responsible for [the warehouseman's] decision, a decision which the State in § 7–210 permits but does not compel . . . ." 436 U.S. at 165. So too in this case, the State of Maine has not compelled the Bank's decision to foreclose. It "has merely announced the circumstances under which its courts will not interfere with a private [act]." *Id.* at 166.

Plaintiffs attempt to distinguish *Flagg Bros.* on the ground that no action by a state official was present in that case. In contrast, under § 6203(2), the sheriff's notice of foreclosure, plaintiffs argue, is the very act by which foreclosure is initiated. Comment, *The Constitutionality of Maine's Real Estate Mortgage Foreclosure Statutes*, 32 Me.L.Rev. 147, 162 (1980). Indeed, the *Flagg Bros.* Court itself distinguished cases such as *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975), and *Fuentes v. Shevin*, 407 U.S. 67 (1972), on the ground that there was "overt official involvement" in those cases. 436 U.S. at 157. More particularly, courts both before and after *Flagg Bros.* have held that mortgage foreclosure statutes which require state of-ficials to play a substantial role in the foreclosure process involve state action. *Dieffenbach v. Attorney General*, 604 F.2d 187, 193–94 (2 Cir. 1979); *Turner v. Blackburn*, 389 F.Supp. 1250, 1254–58 (W.D.N.C.1975) (three-judge court).

Under § 6203(2), however, the sheriff serves only a ministerial role. Unlike the court clerks in *Dieffenbach* and *Turner* who exercised significant supervisory and discretionary powers, the sheriff's duty under § 6203(2) is simply to see that notice is properly delivered to the mortgagee. He is nothing more than a messenger, the proverbial bearer of bad tidings. The performance of ministerial duties by a minor state official does not transform an otherwise private transaction into state action. *Flagg Bros., Inc. v. Brooks, supra*, 436 U.S. at 173–74 & n.12 (Stevens, J., dissenting); *Northrip v. FNMA, supra*, 527 F.2d at 28–29; *Lawson v. Smith, supra*, 402 F.Supp. at 855.

In summary, the Court holds that the Bank's use of § 6203(2) to foreclose on plaintiffs' property did not involve state action. The statute merely regulates the Bank's contractual right to initiate foreclosure proceedings. Even if the statute were held to create new rights, it does not follow that the state should be considered a participant in the foreclosure process. Although the state permitted the foreclosure to occur, in no way did it require that such action be taken.

### 2

#### (a)

In order to trigger the Fifth Amendment due process clause, plaintiffs initially must demonstrate that the federal government—in this case the VA—was a substantial participant in the challenged transaction. In an effort to overcome the "federal action" hurdle, plaintiffs first contend that the VA was heavily involved in the Bank's decision to foreclose on the property. Specifically, they point to the many VA regulations to which the Bank was subject. Among other things, the Bank is required to notify the

VA of a default within 45 days. 38 C.F.R. § 36.4315. If the Bank intends to foreclose, it may not begin legal proceedings until 30 days after delivering to the VA a notice of intent to foreclose. 38 C.F.R. § 36.4317. Upon receiving a notice of default from the Bank, the VA within 30 days may refund the loan, *i. e.*, require the Bank to assign the loan and security to the VA in return for payment of the indebtedness. 38 C.F.R. § 36.4318. Finally, the VA may suspend the Bank from further participation in the VA home loan program if it has failed "to demonstrate proper ability to service loans adequately or to exercise proper credit judgment". 38 U.S.C. § 1804(d).

■ The Court finds plaintiffs' argument in this respect unpersuasive. Extensive regulation in itself does not create government action. It must be established that there is a sufficiently close nexus between the VA and the challenged action of the Bank, *i. e.*, foreclosure, so that the action of the Bank may be fairly treated as that of the VA itself. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350–51 (1974); *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927, 932 (1 Cir.), *cert. denied*, 419 U.S. 1001 (1974); *Jones v. Eastern Maine Medical Center*, 448 F.Supp. 1156, 1161 (D.Me.1978). In this case, the decision to foreclose and the process used to effectuate foreclosure were decisions of the Bank. Once the Bank made the decision to foreclose, the VA could not prevent it from proceeding.[9] The Court finds the required nexus between the VA and the foreclosure decision to be lacking. Other courts likewise have concluded that foreclosure by a private lender of a mortgage in a federal mortgage guaranty program does not involve federal action simply because the lender is subject to extensive federal regulation. *Warren v. GNMA*, 611 F.2d 1229, 1234–35 (8 Cir. 1980); *Roberts v. Cameron-Brown Co., supra*, 556 F.2d at 359.

Plaintiffs also argue that the Fifth Amendment right to due process is impli-

cated in this case because the VA, rather than the Bank, should be considered the foreclosing mortgagee. Plaintiffs acknowledge that it was the Bank who had the notice of foreclosure served upon them on March 24, 1975, pursuant to § 6203(2), but they contend that the process of foreclosure was not complete until the one year period of redemption provided by § 6204 expired. It was only then that the mortgagor's interest expired and absolute title vested in the mortgagee. Comment, *supra*, 32 Me.L.Rev. at 149–50. Because the Bank assigned its interest in the property to the VA on May 5, 1975, before the expiration of the one year redemption period, and because ultimately it was the VA which sold the property to defendant Day, plaintiffs urge that the VA should be considered the foreclosing mortgagee.

Since the Court is convinced for the reasons below that the VA did accord due process to plaintiffs, there is no need to decide this novel argument urged by plaintiffs. The Court will assume without deciding that the VA's role in this case after May 5, 1975 required that its actions be subject to Fifth Amendment due process scrutiny.

### (b)

The starting point for the due process inquiry is this Court's decision in *Ricker v. United States*, 417 F.Supp. 133 (D.Me.1976) (Gignoux, J.). In *Ricker* a federal mortgagee foreclosed and sold the property of an elderly and uneducated farm couple after they defaulted on their mortgage. Prior to the initiation of foreclosure, the couple received a "Notice of Acceleration of Indebtedness and Demand for Payment" which stated that, unless full payment of the indebtedness was received within 30 days, appropriate measures would be taken to foreclose on the property. At the expiration of the 30 day period, the federal mortgagee initiated foreclosure pursuant to § 6203(1) which provides for foreclosure by notice of publication in a newspaper.

---

**9.** The only exception would be if the VA decided to refund the loan pursuant to 38 C.F.R. § 36.4318.

Judge Gignoux held that the federal mortgagee had not afforded the couple due process, reasoning that (1) notice of foreclosure, although in compliance with the statute, was constitutionally inadequate and (2) no opportunity for a hearing had been provided. *Id.* at 138–39.

*Ricker*, however, is distinguishable in significant respects from the case at hand. On the notice element, several critical differences exist. First and foremost, plaintiffs here were served with notice by hand. Notice in *Ricker* was effected by publication in a newspaper—traditionally regarded as a constitutionally suspect method of notice. *E.g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). Indeed, the farm couple in *Ricker* never did receive actual notice of foreclosure. Moreover, in the instant case, on January 17, 1975, prior to foreclosure, the VA notified plaintiffs that foreclosure was imminent. The day before, plaintiffs received a letter from the Bank stating that it was commencing foreclosure proceedings immediately. In contrast, the "Notice of Acceleration of Indebtedness and Demand for Payment" mailed to the farm couple in *Ricker* merely threatened foreclosure. Unlike the notice in the instant case, it did not "give clear notice that foreclosure proceedings would in fact be instituted." 417 F.Supp. at 138.

With respect to the opportunity for a hearing, the *Ricker* court held that the farm couple was entitled to "express written notice of the impending foreclosure, informing them that they were entitled to a hearing at which they could challenge both the legal right of [the federal mortgagee] to foreclose and the propriety of the decision to do so." *Id.* at 139. Here, as stated above, plaintiffs did receive express written notice from the VA of the impending foreclosure. True, they were not informed that they were entitled to a hearing at which they could challenge the foreclosure decision. The VA's notice, however, listed the office hours and telephone number of the VA and invited plaintiffs to contact the VA, which plaintiffs in fact did. Moreover, the Bank and not the VA was the foreclosing mortgagee. The Bank was the only party in a position to grant a hearing at which plaintiffs could challenge the decision to foreclose. In short, prior to initiation of foreclosure proceedings on March 24, 1975, the VA did all that it could do.

■ Finally, the purpose of a prior hearing is "to prevent unfair and mistaken deprivations of property". *Fuentes v. Shevin, supra*, 407 U.S. at 97. That purpose was served in this case by § 6204 which provides that foreclosure is not final until one year after the service of notice provided for in § 6203. *See Ross v. Brown Title Corp.*, 356 F.Supp. 595, 601–02 (E.D.La.) (three-judge court), *aff'd mem.* 412 U.S. 934 (1973). During this period, objection to the foreclosure process can be interposed. Comment, *supra*, 32 Me.L.Rev. at 171 n.100 ("the redemption period remains to correct any errors in the mortgagee's action").[10]

Although this one year period of redemption also was applicable in *Ricker*, the elderly farm couple there was unaware of any foreclosure proceedings and had no contact or opportunity for contact with the federal mortgagee. In contrast, the case at hand involves a Lieutenant Colonel in the Air National Guard who, in the Court's opinion, has had considerable practical experience in real estate matters, who was fully aware that his property was in foreclosure proceedings and who subsequently had several contacts with both the Bank and the VA.

10. Today's decision by this Court should not be read necessarily to mean that §§ 6203(2) and 6204 would pass constitutional muster in a future case which somehow satisfied the state action requirement. The inquiry here is whether the VA accorded plaintiffs due process. The analysis takes into account all forms of notice sent by the VA. In considering whether a statute satisfies due process, however, only those notice requirements that appear on the face of the statute are considered. *Wuchter v. Pizzutti*, 276 U.S. 13, 24 (1928). On the constitutionality of § 6203(2) generally, see Comment, *supra*, 32 Me.L.Rev. at 163–72. On the facts of this case, the Court is not required to pass on the constitutionality of § 6203(2) since state action is lacking. *See* Section IIA1, *supra*, of this opinion.

■ The Court therefore concludes that the VA accorded plaintiffs due process. True, they were not given the exact opportunity for a hearing that the *Ricker* court envisioned. But the requirements of due process vary depending upon the circumstances of each case. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610 (1974) (quoting *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)). Suffice it to say that plaintiffs were accorded sufficient due process in this case so that the Court believes it is appropriate to find, as it does, that they were alerted to the possible loss of their property and that they had a meaningful chance to protest such loss.

## B

■ Plaintiffs next make a wide-ranging claim that the VA abused its discretion when it decided not to refund their loan. The Court holds that it has no authority to review the VA's discretionary decision not to refund and that in any event that decision was not improper.[11]

■ Although plaintiffs do not specify any authority for this Court's review of the VA's decision, it is assumed they rely on the Administrative Procedure Act, 5 U.S.C. § 702 (1976), which provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Under 5 U.S.C. § 701(a)(2) (1976), however, agency action "committed to agency discretion by law" is exempt from the judicial review authorized by § 702. The Court holds that the VA's decision not to refund plaintiffs' mortgage falls within § 701(a)(2).

The refunding statute, 38 U.S.C. § 1816(a) (1976), is "drawn in such broad terms that in a given case there is no law to apply." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S.Rep.No.752, 79th Cong., 1st Sess. 26 (1945)). It provides that the VA "may, at the [VA] Administrator's option" refund a loan. The statute "is as open-ended as it could conceivably be . . . . Because no . . . standards are set forth according to which the [VA] must exercise its discretion, a court has quite literally no indicia by which it may evaluate that exercise and hence no power of review under § 701(a)(2)." *Greater New York Hospital Association v. Mathews*, 536 F.2d 494, 497–98 (2 Cir. 1976).

Plaintiffs contend that refunding decisions are reviewable because the criteria for refunding set forth in the VA Regulations Manual constitute the "law to apply" on judicial review. The Manual, however, is intended only to assist VA employees in the servicing of a guaranteed loan and is merely a non-enforceable policy pronouncement. It does not set forth statutory criteria which can be applied on judicial review. *See Nelson v. Andrus*, 591 F.2d 1265, 1266 (9 Cir. 1978).

■ Even if the VA's decision not to refund were reviewable, the Court holds that the decision was not improper. The VA Regulations Manual provides that, in order to be eligible for refunding, the veteran inter alia must have a present ability to make payments and be desirous of retaining the property. Based on the information available to the VA, plaintiffs satisfied neither of these criteria. The notice of default which the Bank sent the VA on January 15, 1975 stated that plaintiffs were four payments behind and that the property had been for sale for several months. In his

---

**11.** The Court also holds that there is no merit in plaintiffs' claim that they were entitled to a hearing before the refunding decision was made and an explanation after the decision was made as to why they were turned down for refunding. The mere possibility of refunding did not constitute a property interest worthy of due process protection. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 9–11 (1979). And plaintiffs point to no statute or regulation that requires that a hearing be held or that a statement of reasons be provided.

telephone conversation with the VA on January 20, 1975, Mr. Fitzgerald indicated that he was unable to maintain current payments on the Castine property and that it was up for sale. In light of these facts, this Court declines plaintiffs' invitation to second-guess the VA's decision not to refund plaintiffs' loan.[12]

## C

Plaintiffs further claim that they are entitled to the $18,011.35 surplus generated by the VA's sale of the property to defendant Day. Although this argument, at first blush, has a certain surface appeal, the Court holds that there is no legal support for it.

■■■ It is well settled that federal law governs the obligations of the VA in this situation. *United States v. Shimer*, 367 U.S. 374, 377–86 (1961); *United States v. Terrey*, 554 F.2d 685, 692 (5 Cir. 1977); *United States v. Wells*, 403 F.2d 596, 597–98 (5 Cir. 1968). Under federal law the VA has no obligation to account to plaintiffs for any profit made in the sale of property transferred to it under the home loan guaranty program. *McKnight v. United States*, 259 F.2d 540, 545 (9 Cir. 1958); *United States v. Jones*, 155 F.Supp. 52, 56 (M.D.Ga. 1957). No statutory provisions or regulations require such an accounting. In fact, the VA is required to deposit all proceeds realized from the sale of property into the loan guaranty revolving fund. 38 U.S.C. § 1824(c)(2).

■■■ Plaintiffs invoke this Court's equitable powers, stressing that through no fault of their own the government has taken their equity in the Castine property. Upon the facts of this case, however, the Court is unable to hold that plaintiffs are without fault. After the initiation of foreclosure proceedings on March 24, 1975, 14

Me.Rev.Stat.Ann. § 6204 provided plaintiffs with one year in which to redeem their property. They could have redeemed the property by paying off the $34,876.27 due on their mortgage, selling the property and paying off the mortgage from the proceeds or refinancing the mortgage.

Considering plaintiffs' varied resources at that time, it is clear that plaintiffs had the wherewithal to redeem the property. In early 1975 plaintiffs received an offer to buy the Castine property for $65,000 for which earnest money had been put down. Plaintiffs declined this offer and refused to consider any offers less than $70,000. Moreover, plaintiffs never attempted to sell their Milton, Vermont property or to use it as security for a loan to pay off the Castine property. Finally, plaintiffs sold their Belfast property on September 30, 1975 for $22,500. After payment of the $15,000 mortgage, plaintiffs had roughly $7,500 in proceeds at their disposal. All in all, the Court finds that it was possible for plaintiffs to redeem the Castine property before expiration of the one year redemption period on March 24, 1976. Instead, plaintiffs did nothing. As a result of their inaction, absolute title vested in the VA on March 24, 1976. In short, plaintiffs have only themselves to blame for the loss of the equity in their Castine property.

## D

Finally, plaintiffs claim that the VA's transfer of their personal property from the Castine premises to a storage company amounted to a conversion. This claim may be disposed of summarily.

■■■ Under Maine law the limited possession of another's property for a lawful and proper purpose without any intention to deprive the owner of possession does not constitute conversion. *Wyman v. Rob-*

---

12. Plaintiffs also make an unpersuasive argument that the VA violated a duty to them when it failed to request the Bank's forbearance from foreclosure. Even if there were such a duty, the Court holds that the VA did not violate it because, as indicated above, the VA had no good reason to request forbearance by the Bank. For the same reasons, the Court rejects plaintiffs' argument that the Bank's failure to forbear constituted a breach of an agreement with the VA not to foreclose unreasonably for which plaintiffs may maintain an action as third party beneficiaries.

*inson*, 156 Me. 430, 432, 165 A.2d 53, 55 (1960); *Howard v. Deschambeault*, 154 Me. 383, 386, 148 A.2d 706, 707 (1959). In this case, the VA made repeated requests to plaintiffs to remove their personal property from the Castine premises, which by this time no longer belonged to plaintiffs. Confronted by plaintiffs' refusal to remove the personal property, the VA merely arranged to have the property placed in storage. The VA paid the costs of moving and one month's storage and so notified plaintiffs immediately. These actions were not inconsistent with plaintiffs' rights or title. The VA specifically stated in a letter to plaintiffs' attorney that it made no claim to the personalty. Under these circumstances, no conversion occurred.

Accordingly, the Clerk of the Court is ordered to enter a judgment on the merits in defendants' favor on all counts. Costs of this action are to be taxed against plaintiffs in favor of defendants.

IT IS SO ORDERED.