677 F.2d 692
 John and Dolores RANK, Plaintiffs-Appellees,
v.
Robert P. NIMMO,* Administrator of the Veterans
Administration, et al., Defendants-Appellants.
John and Dolores RANK, Plaintiffs-Appellees,
v.
Robert P. NIMMO,* Administrator of the Veterans
Administration, et al., Defendants,
and
The Kissell Company, an Ohio corporation, Defendants-Appellants.
 Nos. 79-3128, 79-3205.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 1, 1980.
Decided Feb. 23, 1982.
As Amended on Denial of Rehearing and Rehearing En Banc May 6, 1982.
 
 John F. Cordes, Washington, D. C., Andrea Sheridan Ordin, U.S. Atty., Los Angeles, Cal., for Nimmo.
 Franklin K. Lane, III, Richard A. Rothschild, Los Angeles, Cal., argued, for Rank; Richard A. Paez, Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE, NORRIS, and REINHARDT, Circuit Judges.
 NORRIS, Circuit Judge:
 
 
 1
 In 1971, appellees John and Dolores Rank bought a home financed through a mortgage guaranteed by the Veterans Administration (VA) pursuant to the VA Home Loan Guarantee Program, 38 U.S.C. § 1801 et seq. In 1976, the mortgage was foreclosed. The Ranks subsequently brought suit against the VA and the Kissell Company, a private firm that serviced the mortgage, seeking to set aside the foreclosure. On cross-motions for summary judgment based upon stipulated facts, the district court held that the VA Act and various publications distributed by the VA to implement the loan guarantee program created a duty on the part of the VA and private lenders to take all reasonable measures to avoid foreclosure; that the VA and Kissell had breached this foreclosure avoidance duty; and that the veteran borrower could enforce this duty in an equitable action to set aside a foreclosure. The district court further held that the VA's failure to refund to the lender the unpaid balance of the Ranks' loan and receive an assignment of the loan, as authorized by 38 U.S.C. § 1816(a), constituted an abuse of discretion and that the VA had illegally failed to exercise its discretion because it refused to implement an assignment program in the Los Angeles region. Judgment was entered setting aside the mortgage foreclosure, and this appeal followed.
 
 I.
 Statutes, Regulations, and Publications
 
 2
 The policy of the VA housing program "is, broadly stated, to enable veterans to obtain loans and to obtain them with the least risk of loss upon foreclosure, to both the veteran and the Veterans Administration as guarantor of the veteran's indebtedness ..." United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). This policy is effected through a loan guaranty mechanism. A home loan (mortgage) to a qualifying veteran is automatically guaranteed by the VA in an amount equaling 60% of the loan or $27,500,[1] whichever is less. 38 U.S.C. §§ 1803(a)(1) and 1810(c). This guaranty enables the veteran to obtain a home mortgage, through conventional sources, without making a substantial downpayment; "the guaranty provisions ... operate as the substantial equivalent of a downpayment in the same amount by the veteran on the purchase price, in order to induce prospective mortgagee-creditors to provide 100% financing for a veteran's home." United States v. Shimer, supra, 367 U.S. at 383, 81 S.Ct. at 1560.
 
 
 3
 The veteran obtains the guaranteed loan from private commercial lenders.[2] Such lenders may be denied participation in the veterans' home program if, upon "notice and opportunity for a hearing," the Administrator finds that a lender has failed to keep adequate records, failed "to demonstrate proper ability to service loans adequately," failed to exercise proper credit judgment, or taken actions detrimental to the government or to veterans. 38 U.S.C. § 1804(d).
 
 
 4
 Upon default by a veteran on his mortgage, the private lender must notify the VA within forty-five days, 38 C.F.R. 36.4315, and if the lender intends to foreclose, he may not begin legal proceedings until thirty days after delivering a notice of his intent to the VA. 38 C.F.R. 36.4317. Upon foreclosure, the lender, if he turns out to be the purchaser, generally may convey the property to the VA. 38 C.F.R. 36.4320.
 
 
 5
 An option known as "refunding" is available to the VA in cases of default. The "Administrator may, at the Administrator's option, pay the holder of the obligation the unpaid balance of the obligation plus accrued interest and receive an assignment of the loan and security." 38 U.S.C. § 1816(a); 38 C.F.R. 36.4318. The VA thus may take over defaulted mortgages from private lenders and avoid foreclosure by extending forebearance to the veteran.
 
 
 6
 In connection with its home mortgage program, the VA publishes, inter alia, a Lenders' Handbook and issues circulars to its regional offices. The Lenders' Handbook, VA Pamphlet No. 26-7 (Revised), is introduced by a note stating:
 
 
 7
 "(The Handbook is) designed to guide lenders in the processing of applications for loans ... and in the treatment of defaults and claims arising through loans made. Nothing contained here shall be construed to modify or otherwise alter any provisions of the regulations." The text of the Lenders' Handbook provides, inter alia:
 
 
 8
 It is the policy of the VA, consistent with the beneficial nature of the law, to encourage holders (servicers) to extend all reasonable forebearance in the event a borrower becomes unable to meet the terms of his loan. Its purpose is to help veteran-borrowers retain their homes, farms and businesses without prejudicing the holders' rights under their contracts of guaranty or insurance.... (I)t is not expected that holders will file claims or institute action to terminate loans, until every reasonable effort has been made to arrive at some other solution.
 
 
 9
 The Lenders' Handbook advises lenders "to follow accepted standards of loan servicing employed by prudent lenders generally" and notes that the "VA may, where the circumstances warrant, supplement the holder's efforts in connection with the servicing of defaulted loans." It points out, however, that the loan guaranty "is in part predicated upon the understanding that adequate loan servicing will be performed by the holder" and that "(t)he VA does not prescribe how loans should be serviced."
 
 
 10
 In Circular 26-75-8, sent to its employees in January 1975, the VA pointed to adverse economic conditions and ordered its employees to attempt to ameliorate veterans' economic difficulties. Specifically, the VA employees were instructed to review carefully each notice of default to determine if servicing was adequate, to urge private lenders to perform adequate loan servicing, to counsel veterans with mortgage problems, and to undertake supplemental servicing when necessary. See VA Manual M26-3, Change 46, 2.35.
 
 
 11
 Finally, VA Manual M26-3 (intended for use by VA employees) provides criteria, in cases of default, to guide VA employees in exercising the assignment/refunding option authorized by 38 U.S.C. § 1816(a). Paragraph 2.39(d) of that Manual states that refunding is permissible when it is "established beyond reasonable doubt that:
 
 
 12
 1. The refunding will be in the best interests of the VA.
 
 
 13
 2. The default was not willful.
 
 
 14
 3. The borrower is desirous of retaining his property.
 
 
 15
 4. The borrower is deserving of VA assistance."
 
 II.
 The Factual Background
 
 16
 The material facts in this case were stipulated. In 1971 plaintiffs, John and Dolores Rank, bought a home in Pomona, California for $16,950 and financed their purchase through a loan for the full purchase price from the Trinity Mortgage Company. The VA guaranteed the loan pursuant to its housing program. Ultimately, after several transactions, the loan (which was secured by a deed of trust-i.e., a mortgage) and mortgage were assigned to the Government National Mortgage Association (GNMA), with a private mortgage firm called the Kissell Company acting as the servicing agent. The Ranks were to pay the Kissell Company $148 per month.
 
 
 17
 Throughout the 1973-74 period, the Ranks had difficulty making their loan repayments on time, but they eventually would cure their delinquencies. Beginning with the payment due in February 1975, however, the Ranks failed to make further payments. John Rank had been laid off from his $900 per month job in December 1974, and was subsisting on $360 per month in unemployment benefits, except for two months of salary as a welder. A Kissell representative, C. B. Cohen, subsequently met with the Ranks, but was unable to resolve the non-payment problem. A later meeting was similarly unsuccessful, as Cohen concluded that the Ranks' expenses exceeded their income.[3] In the meantime, the Valley Association of Cities (VAC) had contacted the VA and Kissell regarding the Ranks, and John Rank himself wrote to the VA. In late May, the VA contacted Kissell and was informed that Kissell would consider forebearance upon presentation of a "more definite" repayment plan. Later, Cohen told VAC that the Ranks should offer a written plan, which they eventually did.[4]
 
 
 18
 There were subsequent communications among Kissell, the VA, VAC, and the Ranks. Ultimately, though, Kissell sent to the VA, in September 1975, a Notice of Intention to Foreclose. It stated that the borrower's "income is less than his expenses," and that "no arrangements can be made due to the borrower's financial problems". Kissell gave notice to the Ranks of the impending foreclosure, and the VA informed the Ranks that it could do nothing for them. In early 1976, John Rank had obtained employment and made a new repayment proposal to Kissell, but it was refused.
 
 
 19
 In December 1975, a Notice of Default was recorded in Los Angeles County pursuant to California law. In April 1976, the property was sold at a non-judicial foreclosure sale to Kissell. Pursuant to VA regulations, Kissell then conveyed the property to the VA as part of the guaranty arrangement. Just before the foreclosure sale, in April 1976, the VA concluded that assignment/refunding (pursuant to 38 U.S.C. § 1816(a) and 38 C.F.R. 36.4318) was "not warranted."[5]
 
 III.
 District Court Proceedings and Decision
 
 20
 The Ranks filed this lawsuit in October 1976, seeking, in essence, an invalidation of the mortgage foreclosure and restoration of their ownership rights on the grounds that "defendants failed to perform adequate servicing as mandated by the Veterans' Home Guaranty Program ..." and that the "VA abused its discretion by failing to consider plaintiffs for an assignment under 38 U.S.C. § 1816(a) ..." The Ranks also sought relief on the ground that the foreclosure of their mortgage "by non-judicial means" was "violative of the Fifth Amendment to the United States Constitution."
 
 
 21
 On cross-motions for summary judgment, the district court ruled in favor of plaintiffs. Rank v. Cleland, 460 F.Supp. 920 (C.D.Cal.1978). The court held that 38 U.S.C. § 1801 et seq. and 38 C.F.R. 36.4300 et seq. "impliedly require that VA guaranteed home loans be adequately serviced by the Veterans Administration and private lenders," and that the VA's Lenders' Handbook, its Circular 26-75-(8), and its internal manuals "impliedly require that VA and private lenders must take all reasonable measures to avoid foreclosure." Further, according to the district court, these "foreclosure avoidance rules impose mandatory duties on both private lenders and the Veterans Administration," and "are binding ... notwithstanding the fact that they were not published in the Federal Register pursuant to the Administrative Procedure Act ..."
 
 
 22
 The court concluded from the stipulated facts that the VA and Kissell had violated their mandatory "foreclosure avoidance" duties in this case. "Veteran borrowers," the district court said, "may maintain civil actions against private lenders and VA charging violation of statutory servicing requirements."
 
 
 23
 The district court ruled finally that the VA's refusal to take an assignment of the plaintiff's home loan, and to refund it, pursuant to the statutory authorization of 38 U.S.C. § 1816(a), "was an abuse of discretion ... because plaintiffs clearly met VA's own criteria for assignment set out in VA Manual M26-3, ..." and because the VA failed to supply reasons for not exercising the assignment/refunding option. The court stated as well that the VA's failure to implement the assignment option in the Los Angeles region in 1974-76 "constituted an illegal failure to exercise discretion."[6]
 
 
 24
 The Ranks were ordered restored to their ownership position, and the VA was ordered to consider assignment/refunding and to provide reasons for any refusal to exercise that option.[7]
 
 
 25
 This appeal followed.IV.
 
 The Foreclosure-Avoidance Issues
 A. The VA Act
 
 26
 In Simpson v. Cleland, 640 F.2d 1354 (D.C.Cir.1981), decided after this appeal was briefed and argued, the D.C. Circuit held that the well-established principles of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[8] and its progeny compel the conclusion that no implied cause of action exists under the VA Act against the VA or the private lender for failure to help a veteran borrower avoid foreclosure.
 
 
 27
 We agree with the D.C. Circuit that neither the statutory language nor the legislative history of the VA Act provides any "indication of legislative intent ... to create such a remedy" against the private lender. Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2087. The home loan guaranty program was designed to induce private lenders to extend home loans to veterans-with "the guaranty provisions ... operat(ing) as the substantial equivalent of a down payment." United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). It relies on financial incentives to accomplish a welfare objective and does not purport to confer enforceable federal rights directly on the veteran-borrower. See Shivers v. Landrieu, 674 F.2d 906, 911 (D.C.Cir.1981) (mortgage insurance provision of the National Housing Act was intended to induce private entrepreneurs to enter the housing market, thus ultimately redounding to the advantage of veteran tenants, but was not intended to create federal rights in favor of veteran tenants); Roberts v. Cameron-Brown, 556 F.2d 356, 360 (5th Cir. 1977) (Lenders' Handbook outlining foreclosure-avoidance duties delineates the relationship between the government and the private lender and gives the mortgagor no claim to duty owed).
 
 
 28
 More importantly, "mortgage foreclosure has traditionally been a matter for state courts and state law, and there are state law remedies available to protect mortgagors from unconscionable mortgages." Roberts v. Cameron-Brown Co., supra, 556 F.2d at 361 (rejecting a private cause of action by mortgagors against private lenders for failure to comply with foreclosure-avoidance guidelines under the HUD-insured home mortgage program). Accordingly, we consider it most improbable that the VA Act was intended to authorize the federal courts to create, with respect to the area of VA-guaranteed home loans, a federal common law of mortgages to supplement or supplant the law provided by the states.[9]
 
 B. The Administrative Procedure Act
 
 29
 The Ranks contend that even if no private cause of action can be derived from the VA Act, the VA's failure to take foreclosure-avoidance measures is judicially reviewable under § 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.
 
 
 30
 5 U.S.C. § 702 states that "(a) person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 706(1) directs the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed ..." These sections of the APA create a right of judicial review of agency action unlawfully withheld. See Rockbridge v. Lincoln, 449 F.2d 567, 569-70 (9th Cir. 1971); Society Hill Civil Assoc. v. Harris, 632 F.2d 1045, 1055 (3rd Cir. 1980). We must therefore consider whether the VA Act and its regulations create a legally enforceable duty on the part of the VA to take all reasonable measures to avoid foreclosure.
 
 
 31
 1. Duty of the VA to Provide Supplemental Servicing
 
 
 32
 It is clear that the VA Act, by its terms, imposes no legal duty upon the VA to undertake loan servicing of VA-guaranteed loans. If such duty exists, it must be derived from statements found in the Lenders' Handbook and VA circulars. We note at the outset "that not all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court." Chasse v. Chasen, 595 F.2d 59, 62 (1st Cir. 1979). In order for the Lenders Handbook and the VA circulars to have the "force and effect of law," they must (1) prescribe substantive rules-not interpretive rules, general statements of policy or rules of agency organization, procedure or practice-and, (2) conform to certain procedural requirements. Chrysler Corp. v. Brown, 441 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979). The first element requires that the rules be legislative in nature, affecting individual rights and obligations. Id. at 302, 99 S.Ct. at 1717. The second element requires that the agency promulgate the rules pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress. Id. at 302-03, 99 S.Ct. at 1717-1718.
 
 
 33
 In this case, we need not reach the question whether the Handbook and circulars were the product of the requisite procedures, for we conclude that neither the VA Handbook nor VA Circular 26-75-8 purports to prescribe "legislative-type" rules enforceable in federal court against the VA. Rather, we view the portions of the Handbook and circulars cited by the plaintiffs as general statements of agency policy and procedure. VA Circular 26-75-8, for example, was issued in response to the economic recession of 1974-75 and was apparently intended as a general guide to VA employees in aiding veterans to weather the economic crisis of those years. To hold such a circular binding on the VA would "hamper seriously the ability of departmental administrators to communicate freely and flexibly with the employees of their departments by means of written directives." Chasse v. Chasen, 595 F.2d 59, 65 (1st Cir. 1979) (Campbell, J. concurring.) Moreover, the fact that the Handbook and circulars (unlike agency proclamations intended to be binding on the VA) were neither published in the Federal Register nor disseminated to the public for scrutiny and comment offers further support for our view that these publications were not intended to have the force and effect of law.[10]
 
 
 34
 Our conclusion that the Handbook and circulars do not create an enforceable duty on the part of the VA to take all reasonable measures to avoid foreclosure is in harmony with the numerous decisions of other courts that have held agency handbooks and circulars of this type unenforceable.[11] See, e.g., Chasse v. Chasen, 595 F.2d 59 (1st Cir. 1979) (Custom Service's circular was an internal policy pronouncement and did not create rights enforceable in federal court); First State Bank of Hudson County v. United States, 599 F.2d 558, 564 (3rd Cir. 1979), cert. denied, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980) (FDIC Manual does not create an enforceable duty on the part of the FDIC to inform Bank about misapplication of its funds by bank president); Concerned Residents of Buck Hill Falls v. Grant, 537 F.2d 29, 38 (3rd Cir. 1976) (Soil Conservation Service Handbook and Guide merely govern internal operating procedures and are not enforceable regulations promulgated under the Administrative Procedure Act); Harrison v. Housing Authority of College Park, 445 F.Supp. 356, 358-59 (N.D.Ga.1978), aff'd, 592 F.2d 281 (5th Cir. 1979) (HUD handbooks are merely advisory); Feldman v. United States Dept. of Housing and Urban Develop., 430 F.Supp. 1324 (E.D.Pa.1977) (same); Brown v. Lynn, 392 F.Supp. 559, 561-62 (N.D.Ill.1975) (HUD handbook directing private lenders servicing HUD-insured mortgages to refrain from foreclosure when other procedures were available was intended as a policy guideline and does not have the force and effect of law).[12]
 
 2. Assignment-Refunding
 
 35
 In addition to holding that the VA and the private lender breached a duty to provide adequate loan servicing, the district court held that the VA abused its discretion by failing to assign and refund the Ranks' loan prior to foreclosure, as permitted by 38 U.S.C. § 1816(a). The VA, however, contends that the decision whether or not to exercise the assignment-refunding option is "committed to agency discretion" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), and thus is not reviewable under that Act.
 
 
 36
 Section 701(a)(2) states a "very narrow exception" to the mandate of the Administrative Procedure Act that the action of "each authority of the Government of the United States" is subject to judicial review. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The exception is applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Id. See City of Santa Clara v. Andrus, 572 F.2d 660, 666-69 (9th Cir. 1978), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978); Moore v. Johnson, 582 F.2d 1228, 1233 (9th Cir. 1978); Arizona Power Authority v. Morton, 549 F.2d 1231, 1239-41 (9th Cir. 1977), cert. denied, 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977).
 
 
 37
 The assignment-refunding section of the VA Act, 38 U.S.C. § 1816(a) provides in pertinent part:
 
 
 38
 Before suit or foreclosure the holder of the obligation shall notify the Administrator of the default, and within thirty days thereafter the Administrator may, at the Administrator's option, pay the holder of the obligation the unpaid balance of the obligation plus accrued interest and receive an assignment of the loan and security.
 
 
 39
 The statutory language of this section makes clear that Congress intended to vest the widest discretion possible in the Administrator. Congress, in drafting § 1816(a), used the precatory "may" and then, as if to leave no doubt, added, "at the Administrator's option." Neither the statute nor the formal regulations published pursuant to 5 U.S.C. § 553 provide any legal standards by which a decision to assign and refund could be reviewed; and we agree with the courts in Fitzgerald v. Cleland, 498 F.Supp. 341 (D.Me.1980), aff'd in part, vacated in part, 650 F.2d 360 (1st Cir. 1981) and in Gatter v. Cleland, 512 F.Supp. 207 (E.D.Pa.1981), that the criteria for refunding set forth in the VA Manual do not constitute enforceable statutory criteria that can be applied on judicial review. See generally, Section IV. A. 1., supra; see also Nelson v. Andrus, 591 F.2d 1265, 1266 (9th Cir. 1978).
 
 
 40
 The decision to accept an assignment of a veteran's loan necessarily involves a consideration of myriad factors, including, but not limited to, internal VA management considerations relating to budget and personnel, the risk of loss to the VA, the adequacy of prior loan servicing, and the circumstances of the borrower's default. The application of these factors, as well as the determination of other relevant factors and the weight to be attributed to each, has been entrusted to the unfettered discretion of the VA. Even if legal standards for review could be divined, it is clear that, absent allegations that the agency has improperly considered factors outside those entrusted to its discretion, the decision whether to assign and refund raises issues not well-suited for determination by the courts. We thus conclude that the VA's decision not to assign and refund appellees' home loan is not judicially reviewable.
 
 
 41
 The district court also held that the VA's failure to assign and refund any loans in the Los Angeles region from 1974 through 1976 was a refusal to implement the assignment-refunding program and hence an illegal failure to exercise its discretion. Whether the VA is required to implement the assignment refunding program is essentially an issue of statutory interpretation and within the judiciary's traditional area of expertise. See Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043-45 (D.C. Cir. 1979). See also Southern Railway v. Seaboard Allied Corp., 442 U.S. 444, 458-59, n.11, 99 S.Ct. 2388, 2396, 60 L.Ed.2d 1017 (1979) (" 'different considerations' apply to the reviewability of an agency 'refus(al) or fail(ure) to exercise statutory discretion' than to the reviewability of its decision once it does exercise that discretion," citing Schilling v. Rogers, 363 U.S. 666, 676-77, 80 S.Ct. 1288, 1295, 4 L.Ed.2d 1478 (1960)); East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524, 529 (9th Cir. 1972).
 
 
 42
 Nothing in the statutory language or history of section 1816(a) indicates that Congress intended to require the VA to exercise the assignment-refunding option during the years 1974-76. Rather, the language of § 1816(a) indicates that Congress simply intended to empower the VA to refund, at its discretion, loans that are in default. By so doing, Congress provided an additional remedy that the VA may use in the event of inadequate loan servicing by the lender. See note 9, supra. Both the precatory language of § 1816(a) and the absence of any standards or procedures governing the administrator's exercise of the assignment-refunding option, however, indicate that Congress intended to leave the decision when, if ever, to apply the assignment-refunding remedy within the sound discretion of the Administrator. (W)here the duty to act turns on matters of highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1957) (citations omitted). We thus conclude that the VA is free to adopt a stringent policy with respect to assignment-refunding, reserving the option for the exceptional or unusual case, or, indeed, to adopt no program at all.[13]
 
 
 43
 This case is readily distinguishable from the cases relied on by the plaintiffs where the applicable statute or legislative history clearly revealed a Congressional intent to require the agency to implement a statutory program. See Rockbridge v. Lincoln, 449 F.2d 567, 571 (9th Cir. 1971) ("There can be no question but that when Congress enacted § 261 it intended that the Commissioner would 'specify(ing) the kind and quantity of goods and the price at which such goods shall be sold to the Indians' ... (The Commissioner does not have) unbridled discretion to refuse to regulate ...."); Standard Oil Co. of Cal. v. F.T.C., 596 F.2d 1381 (9th Cir. 1979), overruled on other grounds, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (although the F.T.C.'s determination that it has reason to believe that the defendant has engaged in monopolistic practices is committed to the agency's discretion, 15 U.S.C. § 45(b) requires the F.T.C. to make such a determination before issuing an F.T.C. complaint); Abrams v. Hills, 547 F.2d 1062 (9th Cir. 1976), cert. dismissed, 439 U.S. 1001, 99 S.Ct. 607, 58 L.Ed.2d 675 (1978) (Congress did not intend to give the Secretary of Housing and Urban Development the discretion to decline to spend any of the money targeted for the operating subsidy program.) In short, we conclude that the VA's refusal to assign and refund any VA-guaranteed loans in Los Angeles during the years 1974-76 was not in violation of any statutory duty created by § 1816(a).
 
 V.
 Constitutional Claim
 
 44
 The Ranks also claim that the VA deprived John Rank of his statutory entitlement to the benefits of the VA guaranty home loan program without affording him due process of law under the Fifth Amendment.
 
 
 45
 The Due Process Clause of the Fifth Amendment applies to actions of the federal government and not to individual activities of private actors. In order to apply the proscriptions of the Fifth Amendment to private actors "there must exist 'a sufficiently close nexus between the (government) and the challenged action of the ... (private) entity so that the action of the latter may be fairly treated as that of the (government) itself.' " Warren v. Government National Mortgage Ass'n, 611 F.2d 1229, 1232 (8th Cir. 1980), cert. denied, 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980), quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).
 
 
 46
 In the present case, the alleged loss of the entitlement under the program was the direct result of foreclosure by the private lender under a valid contract between the appellees and the private lender, and cannot be attributed to the federal government. Although the private lender was subject to extensive federal regulation under the federal home loan guaranty program, this, alone, in our view, is insufficient to convert the actions of the private lender into governmental action. See Fitzgerald v. Cleland, 498 F.Supp. 341, 349 (D.Maine, 1980), aff'd on other grounds, (1st Cir. 1981). Cf. Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 350-51, 95 S.Ct. at 453 (public utility's termination of electric service does not implicate Due Process Clause of Fourteenth Amendment).[14] We thus conclude that foreclosure by a private lender of a mortgage in a federal mortgage guaranty program does not involve federal action sufficient to invoke the due process clause of the Fifth Amendment. See Warren v. Government National Mortgage Ass'n, supra; Roberts v. Cameron-Brown Co., 556 F.2d 356, 358-60 (5th Cir. 1977); Fitzgerald v. Cleland, supra, 498 F.Supp. at 348-49.
 
 
 47
 For the foregoing reasons, the district court's judgment is REVERSED.
 
 
 48
 REINHARDT, Circuit Judge, dissenting.
 
 
 49
 I dissent from that part of the majority's opinion which treats the VA's refusal to exercise its discretion under section 1816(a).
 
 
 50
 The district court found that the VA refused to exercise section 1816(a) assignment authority during 1974-1976 in the Los Angeles region and concluded that in so doing the VA had illegally failed to exercise its discretion. The majority does not dispute the factual finding. Yet it reverses the district court's conclusion of law and decides that the VA is merely "empower(ed)" to utilize assignment-refunding and is therefore free to ignore the existence of the statutory provision entirely, as the district court found it did here. Under this construction of the statute, the Administrator can refuse to exercise any of the discretion given him by section 1816(a), without providing or, more important, having any reason for so doing. This interpretation is unsupported by precedent or the rules of statutory construction. Therefore, I would affirm that portion of the district court's judgment (1) finding that the VA's failure to take any action regarding VA guaranteed home loans under section 1816(a) constitutes an illegal failure to exercise its discretion, and (2) requiring the VA to consider refunding and assignment of plaintiff's loan obligation.
 
 
 51
 The majority concludes that the VA has no statutory duty to implement the provisions of section 1816(a), but cites only a dictum from Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1957), in support of its novel position.
 
 
 52
 That authority is not persuasive here. So far as I can determine, Mr. Justice Douglas' dictum has never been cited by any federal court. Moreover, the case itself has never been cited, nor relied on, by the Supreme Court in any of the dozens of later cases treating the reviewability of an agency's action or inaction.
 
 
 53
 In other cases raising the question whether "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1976), current law requires a reviewing court "to determine 'whether nonreviewability can fairly be inferred.' " Morris v. Gressette, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977), quoting Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). This test is not similar or even related to the standard suggested by the majority. Nor is it qualified by any references to "large or loose statutory terms." Panama Canal Co., 356 U.S. at 318, 78 S.Ct. at 757. Moreover, although Panama Canal Co. has not been formally overruled, its usefulness for any purpose is doubtful. As the Fifth Circuit stated in Chevron Oil Co. v. Andrus, 588 F.2d 1383, 1391, n. 14 (5th Cir. 1979), "(T)he continued vitality of the Panama Canal Co. case as precedent is questionable."
 
 
 54
 The majority's treatment of our Circuit's precedent is equally unsatisfactory. It merely purports to distinguish three cases supporting a view contrary to its own: Rockbridge v. Lincoln, 449 F.2d 567 (9th Cir. 1971); Abrams v. Hills, 547 F.2d 1062 (9th Cir. 1976) cert. dismissed, 439 U.S. 1001, 99 S.Ct. 607, 58 L.Ed.2d 675 (1978); and Standard Oil Co. of California v. FTC, 596 F.2d 1381 (9th Cir. 1979) overruled on other grounds, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). In each of these cases we required an administrator to exercise discretion and implement the statutory authority. The majority distinguishes these cases by saying that the statutes there involved reflected a Congressional intent that some regulation occur.
 
 
 55
 The majority's rationale for distinguishing our applicable precedent is unpersuasive. The government, which suggested the rationale in its brief, gleans a Congressional intent in Rockbridge from the unsurprising idea that the statute there construed was "passed with a specific set of legislative objectives in mind." I trust that neither the government nor the majority intends to imply that section 1816(a) was passed without any legislative objectives in mind. That proposition would violate the hornbook rule that statutes must be construed to have both meaning and purpose. In Professor Llewellyn's formulation: "If a statute is to make sense, it must be read in the light of some assumed purpose. A statute merely declaring a rule, with no purpose or objective, is nonsense." Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons about how Statutes are to be Construed, 3 Vand.L.Rev. 395, 400 (1950). Making that assumption, the majority's suggestion appears to be that since section 1816(a) was incorporated in a statute which had only a general set of legislative objectives, Congress did not intend to require that the specific provision be implemented. Whatever may recommend this concept, the majority offers no reasoning or explanation in support of it.
 
 
 56
 In enacting section 1816(a) Congress quite sensibly refrained from instructing the VA as to the particular circumstances under which it should accept assignments of loans and refund them, preferring to leave these practical decisions to the discretion of the agency. The majority characterizes Congress' action as an "absence of any standards or procedures governing the administrator's exercise of the assignment refunding option ...." Ante at 700, and then, relying on this supposed absence of standards, leaps to the conclusion that section 1816(a) need not be implemented. There is no precedent supporting this leap in logic; nor is there any basis for the majority's newly discovered principle of administrative law-if standards are not set forth, the statute is lawful but the agency charged with its enforcement is free to ignore it.
 
 
 57
 The notion that Congress must or should state a standard, policy or principle in every regulatory statute is denied in the cases[1] and by the commentators.[2] Without an explicitly declared Congressional intent, a court should not announce an absence of any standards but should look to whatever intent may be fairly inferred from the entire legislative scheme.[3]
 
 
 58
 Here, it seems clear that Congress intended to grant veterans as much reasonable forebearance in servicing their loans as possible. Indeed, just a year after the 78th Congress created the loan guarantee program, the 79th Congress extensively expanded its scope by adding three new sections allowing different financing techniques to allow maximum forebearance. Act of December 28, 1945 ch. 588, § 8, 59 Stat. 623, 626 (1945) (current version in part at 38 U.S.C. § 1816 (1976)) (amending Serviceman's Readjustment Act of 1944, ch. 268, §§ 500-505, 58 Stat. 284 (1944)).[4] These provisions, which include the precursor of section 1816(a), set out repurchase, refinancing and insurance techniques for preserving veterans' titles to their homes. If Congress intended to provide reasonable forebearance to veteran borrowers, which it did, provided various financing techniques, which it did, it seems a reasonable inference that it intended the techniques to be used.[5]
 
 
 59
 I cannot concur in the majority opinion for another reason. I simply cannot reconcile the majority's earlier conclusion that the VA's exercise of its discretion in "deciding" not to assign and refund appellee's home loan is not reviewable with its later conclusion that the VA is merely empowered, under the statute, to exercise discretion, is not required to do so, and that its failure to exercise any discretion at all was lawful. Throughout the earlier part of its analysis, the majority refers to the VA's decision not to assign and refund appellees' loan. It holds, "We thus conclude that the VA's decision not to assign and refund appellees' home loan is not judicially reviewable." Ante at 700 (emphasis added). And yet in the next part of its analysis, it approves the VA's failure to make a decision as to appellees' loan, and as to all other loans, on the theory that the VA is merely empowered to exercise its discretion but need not actually do so.
 
 
 60
 Earlier, in dealing with the question whether the court may review a particular decision of the VA not to refinance a specific loan, the majority approves the following contention of the VA: "(T)he decision whether or not to employ the assignment-refunding option is 'committed to agency discretion' within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), and thus is not reviewable under that Act." Ante at 699. I agree.[6] But implicit in the VA's (and the majority's) contention is the proposition that the agency must exercise the discretion which is committed to it. It must do so by making decisions as to whether or not to employ the assignment-refunding option. While we cannot review the agency's decisions after it makes them, we can and must review the agency's attempt to ignore its discretion and its failure to make any decisions at all.
 
 
 61
 The majority's analysis suffers from other internal inconsistencies. For example, the statement at footnote 9, where the majority relies on the section 1816(a) "remedy" to support the conclusion that no private cause of action exists cannot be harmonized with the section of the opinion under discussion here. While I do not quarrel with the footnote 9 conclusion that Congress intended section 1816(a) to provide a remedy for veterans, I find it troublesome that the majority relies on the existence of that remedy as a basis for holding that veterans have no private right of action and then subsequently concludes that the VA may simply ignore the provision and, without any reason, deprive all veterans of this "remedy" entirely.
 
 
 62
 My conclusion is not that section 1816(a) assignments must be instituted once a month, once per thousand defaults or with any other particular frequency. Nor am I contending that we may review a decision by the VA not to pay the holder of an obligation the unpaid balance in a particular case in which the VA has made the specific judgment not to do so. My conclusion is simply that the VA cannot ignore the statute.[7]
 
 
 63
 Because the majority legitimizes the VA's neglect of its discretion, I dissent.
 
 
 
 *
 We substitute the name Robert P. Nimmo, the successor in July 1981 to the original defendant, Max Cleland, pursuant to Fed.R.App.P. 43
 
 
 [1]
 At the time plaintiffs received their loan, the amount was $12,500 rather than $27,500. 38 U.S.C. § 1810(c) (1970)
 
 
 [2]
 The VA also has a direct home loan program, 38 U.S.C. § 1811, and a mortgage insurance program, 38 U.S.C. § 1815. These programs are not involved in the present case, which arose under the loan guaranty program
 
 
 [3]
 Cohen offered the Ranks the alternative of selling their house, obtaining a second mortgage, or making monthly payments equal to 1.5 times the regular monthly payments. The Ranks attempted unsuccessfully to obtain a second mortgage. They also tendered one month's payment to Kissell, plus a small additional amount, in late May 1975. Kissell declined to accept the payment, pointing to the Ranks' previous delinquencies and stating that "it is obvious that you cannot afford the property."
 
 
 [4]
 John Rank proposed that he pay $180 per month out of his $360 unemployment check (R. 112). The Ranks apparently never received a reply to this letter
 
 
 [5]
 The fact stipulation filed below contained, aside from the details of the Ranks' particular case, a description of the operations at the Los Angeles VA Regional Office (R. 115-19). It was stipulated, inter alia, that the VA's Los Angeles employees spent most of their time servicing the VA's direct loans, not loans in the loan guaranty program; that the VA conducts supplemental servicing of guaranteed loans only when the veteran is in a solvent enough position that his default likely can be cured; that in 1974-76 the VA obtained no loans on assignment under 38 U.S.C. § 1816(a) and 38 C.F.R. 36.4318; that the Ranks did not know of the refunding option or that refunding had been denied; and that there are no regulations requiring that notice on refunding be given to borrowers like the Ranks
 
 
 [6]
 The court crossed out the Ranks' proposed findings and conclusions on their alternative theory that the non-judicial foreclosure was unconstitutional. On appeal, the parties have been permitted to file supplemental briefs arguing the constitutional issue
 
 
 [7]
 The district court's order was stayed pending the outcome of this appeal. In the meantime, the Ranks continue to reside in the house that is the subject of this litigation
 
 
 [8]
 In Cort v. Ash, the Court articulated four factors that inform the decision whether to imply a cause of action under a federal statute: whether the "statute create(s) a federal right in favor of the plaintiff"; whether there is "any indication of legislative intent ... to create such a remedy"; whether implying a remedy is "consistent with the underlying purpose of the legislative scheme"; and whether the cause of action is "one traditionally relegated to state law." Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087. See Glacier Park Foundation v. Watt, 663 F.2d 882, 884-885 (9th Cir. 1981); Osborn American Ass'n. of Retired Persons, 660 F.2d 740, 745 (9th Cir. 1981)
 
 
 [9]
 In addition, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Transamerica Mortgage Advisors v. Lewis, 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); see Northwest Airlines v. TWU, 451 U.S. 77, ----, n.30, 101 S.Ct. 1571, 1582, n.30, 67 L.Ed.2d 750 (1981). In this case, the statute provides administrative remedies against private lenders for inadequate servicing. Section 1804(d) authorizes the VA to deny participation in the loan guaranty program to private lenders who fail to provide adequate servicing of VA-guaranteed loans, and section 1816(a) permits the VA to refund the unpaid balance of the borrower's loan obligation to the lender and receive an assignment of the loan and security from the lender
 
 
 [10]
 There is also nothing in the record to suggest that the Ranks in any way relied to their detriment on VA Circular 26-75-8
 
 
 [11]
 Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), relied on by appellees, is distinguishable. In Thorpe, HUD issued a circular requiring local housing authorities to explain to tenants facing eviction from federally-funded housing the reasons for the eviction. The Court held that the circular, issued pursuant to HUD's rule-making power, was intended to have the force and effect of law. In Thorpe, however, the circular was to be incorporated into a HUD Manual containing implementing regulations that were, according to HUD, " 'the minimum considered consistent with fulfilling Federal responsibilities' under the Act." 393 U.S. at 275, 89 S.Ct. at 522. The circular was thus distinguished from the various "handbooks" and "booklets" issued by HUD that contain mere "instructions," "technical suggestions," and "items of consideration." Id
 
 
 [12]
 The legislative history of the Act, although generally unilluminating, suggests that Congress did not envision mandatory supplemental servicing by the VA. The loan guarantee program was originally conceived as a direct loan program administered by the VA to veterans. Because of congressional concern that such a program would require the creation of a huge, unwieldy bureaucracy, the loan guarantee provisions, designed to induce private lenders to make the loans to veterans, were substituted for the direct loan program. See, e.g., 90 Cong.Rec. 4654 (1944) (remarks of Rep. Jeffrey)
 
 
 [13]
 The dissent suggests that this construction deprives § 1816(a) of any meaning or purpose. We fail to understand, however, why it is meaningless to provide an administrative agency with a remedial tool that it may otherwise be powerless to employ. It is possible, of course, as the dissent is apparently persuaded, that the assignment-refunding option of § 1816(a) would be more effective if the administrator were required to establish criteria and procedures for determining when refunding is warranted, or otherwise to establish an assignment-refunding "program." That judgment, however, is for the legislature, not the judiciary. Nothing in the statutory language or history of § 1816(a) indicates that Congress contemplated such requirements. On the contrary, the legislative history suggests that Congress may originally have intended that § 1816(a) be used simply as an alternate method of foreclosure. The House Report accompanying the 1945 amendments to the VA Act states that, under § 1816(a), the "Administrator may, at his option, pay the lender the unpaid balance of the loan plus accrued interest and receive an assignment of the loan and security and thereafter sue or foreclose in the name of the Veterans Administration." H.R.Rep. No. 926, 79th Cong., 1st Sess. 4 (1945) (emphasis added). We should be hesitant to read into the statute a requirement that the VA implement an assignment-refunding "program," when it is not even clear that Congress contemplated that § 1816(a) would be used for the purpose of refinancing a veteran's loan
 Moreover, we are unable to discern what it is that the dissent would have the VA do. The dissent avoids any delineation of the "program" supposedly required by § 1816(a), no doubt because the statute and the legislative history are silent on the issue. Indeed, the dissent carefully specifies what it would not require of the VA and what it does not decide; yet it would give the VA no affirmative guidance beyond a vague admonition not to ignore the statute. We fail to understand what useful purpose would be served by such a standardless directive.
 
 
 [14]
 The Ranks contend that the VA is ultimately responsible for the loss of John Rank's statutory benefits because the VA had authority to avoid the foreclosure by refunding their loan. The VA's failure to exercise the assignment-refunding option of 38 U.S.C. § 1816(a) does not, however, give rise to a due process claim. We concluded above that § 1816(a) creates no judicially enforceable duty on the part of the VA; it follows that § 1816(a) creates no constitutionally protectable property interest, and that the VA's decision not to exercise the assignment-refunding option did not implicate John Rank's due process rights. See Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); McCachren v. United States Dep't. of Agriculture, 599 F.2d 655, 656-57 (5th Cir. 1979); Simpson v. Cleland, supra, 640 F.2d at 1360
 
 
 [1]
 In a different time, standardless Congressional delegations raised different issues. E.g., Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). The unmistakable thrust of later cases is that standardless statutes are necessary to the conduct of government and that the judicial and executive branches "are and must be coordinate branches not only for carrying out policies determined by the legislative branch but also for determining basic policy." K. Davis, Administrative Law Text 30 (3d ed. 1972); See Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)
 As in Fahey, I would suggest that a standardless statute indicates a Congressional judgment that the relevant policy issue is sufficiently complex so as to preclude the statement of specific standards. That judgment does not mean that Congress has retained the policy judgment of whether to create a program. Rather, it means that the basic framework of a program is created and the job of formulating the complex policies necessary to operate the program is delegated to the administrative agency. This principle supports my conclusion that the VA Administrator "cannot ignore the statute," an idea which the majority characterizes as a "vague admonition." Ante at 700 n. 13. See text accompanying n. 7, post at 706.
 Armed with the "vague admonition" that the Administrator must exercise the discretion vested in him by Congress, I believe the VA could properly perform its job of determining when the assignment and refunding of loans should be made.
 
 
 [2]
 E.g., 1 K. Davis Administrative Law Treatise § 3:5 (2d ed. 1978)
 
 
 [3]
 See Rockbridge v. Lincoln, 449 F.2d at 570-71
 "The Rule of Inferred Intent" assumes that every statute is logical and complete and that this completeness can provide appropriate meaning to unglossed terms. See Driedger, A New Approach to Statutory Interpretation, 29 Canadian Bar Review 838 (1951), reprinted in 4 Sutherland Statutory Construction 25, 26 (C. Sands ed.) (1975).
 In Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), Justice Cardozo said: "(T)he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view." Id. at 439, 55 S.Ct. at 256. (Cardozo, J., dissenting) (citation omitted).
 
 
 [4]
 The act also liberalized the legislative scheme by extending the time for loan applications, and providing an automatic 50% guaranty of agreed on loans. See H.R.Rep.No.1449, 79th Cong., 1st Sess. 602 (1945), reprinted in 1945 U.S.Code Cong. Serv. 935
 
 
 [5]
 This inference finds support in the statutory requirement that a lender notify the Administrator thirty days prior to suit or foreclosure. Section 1816(a) provides in part:
 Before suit or foreclosure the holder of the obligation shall notify the Administrator of the default, and within thirty days thereafter the Administrator may, at the Administrator's option, pay the holder of the obligation the unpaid balance of the obligation plus accrued interest and receive an assignment of the loan and security.
 Thus in every case of potential default, a lender must send notice to the VA. There is nothing precatory about that. I find the fact that the notification requirement appears in the same sentence of § 1816(a) as does the assignment-refunding authority to be significant. It is clear that Congress required such notifications so that the VA could consider them in determining whether to enter into particular loan assignments. If Congress had thought the VA could simply ignore the provisions of § 1816(a), as the majority suggests, it would hardly have bothered to require all lenders to send the foreclosure notices in every case. Put affirmatively, since Congress required this information to be conveyed to the VA in all cases, it must at least have intended the VA to consider whether to assign and refund veteran's obligations in some cases.
 For its contrary conclusion, the majority quotes language in H.R.Rep. No. 926, 79th Cong., 1st Sess. 4 (1945). The majority relies on an emphasized clause of the quoted language for the proposition that Congress may not have intended that section 1816(a) be used for the purpose of refinancing a veteran's loan. The majority errs in relying on the emphasized clause. The clause is taken verbatim from an amendment first proposed in the House bill, but subsequently removed from the bill by the Conference Committee. See 59 Stat. 623, 630 (1945). The language relied on by the majority is therefore entirely unpersuasive if not irrelevant on the question whether Congress intended that the VA exercise the section 1816(a) authority granted it by the Act.
 
 
 [6]
 It is clear that the VA and the majority are referring to the decision whether to employ the option in a particular case, and not the decision whether to recognize the assignment-refunding option at all. Shortly after it quotes the VA's contention, the majority says "Neither the statute nor the formal regulations published pursuant to 5 U.S.C. § 553 provide any legal standards by which a decision to assign and refund could be reviewed ..." Ante at 699 (emphasis added). Similarly in describing the discretion given to the VA, the majority says
 The decision to accept an assignment of a veteran's loan necessarily involves a consideration of myriad factors, including, but not limited to, internal VA management considerations relating to budget and personnel, the risk of loss to the VA, the adequacy of prior loan servicing, and the circumstances of the borrower's default. The application of these factors, as well as the determination of other relevant factors and the weight to be attributed to each, has been entrusted to the unfettered discretion of the VA. Even if legal standards for review could be divined, it is clear that, absent allegations that the agency has improperly considered factors outside those entrusted to its discretion, the decision whether to assign and refund raises issues not well-suited for determination by the courts.
 Ante at 700.
 Thus both the majority and the VA recognize that Congress afforded the VA the discretion to make specific decisions and that it is the actual exercise of this discretion which is not subject to judicial review.
 
 
 [7]
 To reach the conclusion I reach here, it is not necessary to decide the question whether the VA could make a deliberate reasoned decision not to implement the assignment-refunding program, although I believe it could not. Nor need we decide whether the VA could suspend implementation of the program for a particular period if it concluded that it had valid reasons for doing so. In this case the record reveals no decision of any kind by the VA, and certainly no decision by the VA to refuse to utilize the assignment-refunding program. Thus, in view of the district court's finding, I can only conclude that the VA simply ignored the law